## Lorraine W. Parker v. Silvia G. Hoefer

(100 A2d 434)

May Term, 1953.

Present: Sherburne, C. J., Jeffords, Cleary, Adams and Chase, J. J.

Opinion Filed October 6, 1953.

█

*Henry F. Black* and *Becker & Martin* (of New York, N. Y.) for the defendant.

*Ryan, Smith & Carbine* for the plaintiff.

Sherburne, C. J. This is an action for alienation of affections by enticement and criminal conversation. It comes here upon the defendant's exceptions after a verdict and judgment for the plaintiff.

It appeared in evidence that after the plaintiff and Robert Parker were married on April 26, 1933, they lived abroad most of the time until June 1940, where he was a foreign correspondent with the Associated Press. On the latter date, because of war breaking out, she returned to this country and he followed in about four months. From then on he was here with her and abroad off and on until the fall of 1943. In the winter following he was working here with UNRA and writing a book. He was with her in South Woodstock a part of the summer of 1944, except for about three weeks when he was away on an air transport command tour of the west. At the end of July he went to Cincinnati and she went out to join him in August and stayed a week househunting, and not finding a house returned to South Woodstock and her two children. While in Cincinnati on this occasion an old friend of both called her on the telephone and introduced her to the defendant, who thereupon invited her and her husband to a dinner party, but she did not accept because she was returning

to South Woodstock. Whether her husband attended this dinner party does not appear, but he testified that in August he became acquainted with the defendant through this same friend. Finally Parker found a house in Cincinnati where he and his wife could live, and she went there with the children on September 19. Early in January, 1945, Parker left the plaintiff and went to the Gibson Hotel, the first of three hotels in Cincinnati at which he later lived. He returned home in March for a month, and then left permanently. The plaintiff obtained a divorce in Ohio in April, 1946, and Parker married the defendant on May 6, 1946, and she obtained a divorce from him in 1949.

The first point made by the defendant is the alleged improper conduct of plaintiff's counsel and of the court. We will take up the instances in the order briefed.

In the writ the defendant is referred to as "Silvia Gould Thompson Parker, also known as Silvia Thomson Parker." Because of her marriage to one Hoefer before the trial the plaintiff moved to amend her name by adding "Hoefer." The defendant had no objection if she was known as Silvia Gould Hoefer during the trial, but didn't like the word "alias", and the court remarked that it didn't see as plaintiff's counsel needed to refer to that before the jury, and allowed the amendment and told him to refer to the defendant as Silvia Gould Hoefer, and plaintiff's counsel said that they did not intend to use the word "alias" and didn't contend that defendant was going under an assumed name. Later plaintiff's counsel, without objection, told the jury that the defendant was Silvia Gould Thomson Parker Hoefer. "The defendant is Silvia Gould Thomson as our evidence will show because Thomson was the name of her first husband, and Parker because Parker was the name of her second husband, and Hoefer because Hoefer was the name of her third husband." Two other occasions are pointed out where the defendant was referred to by the above five word name, and it is pointed out where she was referred to as Silvia Gould Thomson, and where one of plaintiff's witnesses referred to the defendant as "this Gould woman" and the "Gould girl" and another referred to her as

Silvia Gould, all without objection. Defendant's counsel sometimes referred to her as Silvia Gould Parker also.

■ Upon the *voir dire*, after it had appeared that the defendant was not in court, plaintiff's counsel inquired if any of the jury knew the defendant and stated that she was the daughter of Kingdom Gould. Upon objection being made the court ruled, subject to exception, that the plaintiff might inquire if any of the jurors knew the defendant's father or mother, and thereupon the jury was asked if any of them knew Mr. and Mrs. Kingdom Gould of New York, parents of the defendant. The nature and extent of the inquiries which may be made in the preliminary examination of jurymen is largely within the discretion of the trial court, and the exercise of its discretion will not be revised except in cases of its abuse. *State* v. *Turley*, 87 Vt 163, 166, 167, 88 A 562. We find nothing in the transcript to support the statement in defendant's brief: "It is apparent from the record that counsel for the plaintiff originally intended to go back in her lineal background and claim that she was in some way related to the fabled Jay Gould."

In starting to read the deposition of Robert Parker to the jury plaintiff's counsel included the name of the parties as written on the caption "Lorraine Wolcott J. Parker, v. Sylvia Gould Thompson Parker alias Sylvia Gould Parker alias Sylvia Gould Hoefer." To this the defendant objected with particular reference to the use of the word "alias". After a discussion the jury were instructed to pay no attention to this formal statement concerning the deposition. This instruction cured the error, if any, in the reading.

It is stated that defendant's counsel was not given a real opportunity for summation, that he was continually interrupted, falsely accused of mis-stating the record, and maliciously attacked with ill-founded and baseless charges. We are not told anything further about all this but are simply referred to certain pages in the transcript. This is inadequate briefing. Furthermore our attention is not called to any exception.

It is stated that the plaintiff was not above misleading the jury, because as to at least one of the books she testified her husband had written it is a matter of public record that it was

published in the last year and could have had no relevance to the action before the court. Our attention is not called to any evidence as to when the book was published.

The last instance of alleged improper conduct was the conduct of the court in excluding a question asked the plaintiff by defendant's counsel. In asking the particular question defendant's counsel disregarded the court's prior express instruction. It is claimed that the court gave the jury the impression that defendant's counsel had acted improperly. The court was very lenient and if such an impression was given to the jury it resulted from the remarks of such counsel.

No improper conduct has been pointed out that could have prejudiced the jury.

■ The second point made by the defendant relates to the exclusion of certain portions of defendant's cross-examination in the deposition of Robert Parker. Three portions are quoted and briefed, and another is referred to. In 1934, shortly after the marriage of the plaintiff and Parker, they went to Paris to reside where he was attached to the Paris bureau of the Associated Press, and he went off alone on various business trips. Having testified in cross-examination that he did not accuse his then wife of having a boy friend while they lived in Paris, our attention is directed to the following in the deposition.

"Q. You did object to her going out with other gentlemen, did you not, alone?

"A. No. She never did it as far as I know.

\* \* \* \* \* \* \* \*

"Q. If she did you did not know about it, is that right?

"A. No. I can't recall it—I will put it that way.

"Q. So now to-day you do not know whether you knew about it at the time or not, is that correct?

\* \* \* \* \* \* \*

"A. No, it is not correct. I do not get these assumptions here; I think we had better start all over again. I do not know what this man is trying to ask me."

All after the answer to the first quoted question was excluded, and the defendant excepted. All that the defendant claims under this exception is that she wanted to show that when the plaintiff had gone out to dinner with other men in Paris she had done so without her husband's knowledge. The matter excluded added nothing to the information given in the answer to the first quoted question. The scope and extent of cross-examination rests largely in the sound discretion of the trial court and its ruling is not reviewable in the absence of an abuse thereof. *Gero* v. *John Hancock Mut. Life Ins. Co.*, 111 Vt 462, 473, 18 A2d 154. In this instance we see no such abuse.

Our attention is next directed to the following portion of the deposition.

"Q. Then up until August, 1944, from the time of your marriage in 1933, you had always been faithful to Lorraine Wolcott Parker, had you?

"The Witness: What do you mean by that?
[Question read by the reporter]

"The Witness: What do you mean exactly by that?

"Q. You do not understand the question.

"A. No.

"Q. Why are you smiling, Mr. Parker.

"A. Have I not a right to smile.

\* \* \* \* \* \* \* \*

"Q. And you now know what the word 'faithful' means?

"A. I know what you mean by it.

"Q. You didn't know that before, did you?

"A. I didn't know what you meant by it."

The defendant excepted because the question and answer about smiling were struck out, and says it would have suggested to the jury that the witness was not only obviously avoiding the issue but was attempting to be "clever" with

8

counsel, and that the jury might well and properly have drawn certain important conclusions as to the marital relationship between the parties from this testimony.

Following the answer about smiling, the deposition contained the following questions and answers which were read to the jury:

"Q. From 1933 to August, 1944, you have not cohabited with women other than your wife?

"A. I will put that same answer in there, I don't think this has anything to do with it, I think it is impertinent.

"Q. You do not want to answer that question?

"A. I do not think it has anything to do with it.

"Q. And when you wrote to your wife calling her 'Dossie Moosie', weren't you being unfaithful at the very same time?

"A. No certainly not."

This was followed by testimony that he had never cohabited with another woman up to August 1944, and was always faithful to his wife throughout that period of time. Then followed:

"Q. And the reason you objected to answering that question before was that you did not want to mention the fact that you had always been faithful to her, is that correct?

"A. Now I do not think you ought to answer for me.

"Q. I am asking you the question. Answer it please.

"A. You are putting things in there that are not the answers that I would make. Why don't you ask me what is the reason I gave that answer? Don't draw a conclusion.

"Q. Do you refuse to answer that question?

"A. I refuse to answer it in that form.

"Q. And you know what the word 'faithful' means, don't you?

"A. I know what you mean by it.

"Q. You didn't know that before, did you?

"A. I didn't know what you meant by it."

No abuse of discretion is made to appear, nor is it apparent how the defendant was harmed.

All that is said in defendant's brief about the third exclusion of cross-examination is to refer us to certain pages of the deposition and to assert that much that was said by the witness obviously indicated his hostility to the defendant. This is inadequate briefing. We will not search the deposition to see if some passage can be found to support this claim.

The last exclusion of cross examination in the deposition that is referred to was the question: "Was it not in the summer of 1948, that you suggested to her that she institute this action against Sylvia Gould Parker?" and the reply of the witness: "Will you rephrase that question, Mr. Becker, I object to the way it is put." In the discussion before the court plaintiff's counsel stated that there was no evidence in the case that the witness ever suggested that the plaintiff institute this action, and Mr. Becker for the defendant merely replied that it was perfectly good cross-examination, thereby impliedly admitting that there was no such evidence in the case. This cross-examination was properly excluded. The question assumes that the witness had suggested to the plaintiff that she institute the action, and inquires if it was not in the summer of 1948 that he did so. The question is much like the one in State v. Isaacson, 114 Conn 567, 159 A 483, 486. "Was it after you went to Atlantic City in the latter part of January, 1931, that you determined to sue Morasche and talk to him about his former relations with your wife" which was held to assume facts not in evidence. See also In Re Esterbrook's Will, 83 Vt 229, 237, 75 A 1.

Parker was a very material witness. His testimony was given in a deposition. Before this deposition was read to the jury an opportunity was afforded counsel in the absence of the jury to raise objections thereto. Parker having testified that he went to Chicago with a Sunday radio show two or three

times and that he seemed to recall that once it was in the spring of 1945, and again in the fall of 1945, and that he saw the defendant there on the second of these occasions, and was with her and occupied the same room with her in a hotel, was asked: "Did you on that occasion have sexual intercourse with her, Mr. Parker?" and then this colloquy follows:

"The Witness: Do I have to answer that question?

"Mr. Ryan: I would like to have you if you can, if you will.

"The Witness: I do not want to answer it.

"Mr. Ryan: I won't press it if you do not want to answer it."

He was then asked: "Did you register in that hotel with Sylvia Gould Parker as Mr. and Mrs. Robert Parker?" and he answered "Yes." Parker also testified that in December 1944 he went to Washington, D. C. and that he stayed a week at the Willard Hotel and the defendant stayed with him there. He was then asked: "And did you register there as Mr. and Mrs. Robert Parker with her?" and he answered, "Yes." He further testified to living at three different hotels in Cincinnati. He was then asked if, while living at any of these hotels, the defendant ever remained over night with him, and he answered, "She might have."

■■ The defendant excepted to the admission of the first quoted question and the colloquy following it, on the ground that the colloquy afforded the jury a basis for speculation; to the admission of the questions and answers relative to registering at the two hotels, on the ground, among others, that the hotel registers were the best evidence; and to the admission of the answer, "She might have," because pure speculation. It is obvious that some, at least, of these excepted to parts of the deposition should not have been admitted, and for the purposes of this case we will assume that it was error to allow any such part to be read to the jury. On this assumption we must inquire whether the error was prejudicial, since error works a reversal only when the record satisfies the court that the rights of the excepting party have been in-

juriously affected thereby. Supreme court rule 9. *Duchaine* v. *Ray*, 110 Vt 313, 322, 6 A2d 28. And he who alleges error has the burden of showing that he has been prejudiced thereby. *Meyette* v. *Canadian Pacific Ry. Co.*, 110 Vt 345, 356, 6 A2d 33; *Hill* v. *Bedell*, 98 Vt 82, 85, 126 A 493.

██ Adultery may be proven by circumstantial evidence. The only general rule that can be laid down upon the subject is, that the circumstances must be such as will lead the guarded discretion of a reasonable and just man to the conclusion that the act was committed. *Taft* v. *Taft*, 80 Vt 256, 67 A 703. When an adulterous disposition by both parties has been proved to exist and an opportunity has been shown to commit the act, adultery may be inferred. *Shastany* v. *Weeks*, 113 Vt 363, 366, 34 A2d 174.

The undisputed evidence, some of which will be later referred to in connection with other exceptions, shows that the defendant pursued and was infatuated with Parker, and that he yielded to her enticement. The testimony of Parker about their occupying the same room at the Chicago hotel and their staying a week at the Willard Hotel was undisputed. From this undisputed evidence the jury, acting reasonably, could find that an adulterous disposition existed between the parties and that they committed adultery at Chicago and Washington. The colloquy and the questions and answers about registering at the two hotels, by bringing in additional circumstances, may have made the plaintiff's proof of adultery stronger, but the other evidence is so convincing that we are not satisfied that the jury could have failed to find that Parker and the defendant had committed adultery had this cumulative matter been excluded. See *State* v. *Williams*, 94 Vt 423, 431, 111 A 701; *Jenness* v. *Simpson*, 84 Vt 127, 144, 78 A 886. The defendant has not shown that she has been prejudiced by the colloquy and these questions and answers.

For like reason the admission of the answer "She might have", in so far as the fact of adultery elsewhere is concerned, is not shown to have prejudiced the defendant. In considering whether its admission was prejudicial in the matter of damages we consider whether the verdict of $10,000.00 for

compensatory damages indicates that it was. The evidence discloses that at the time that Parker met the defendant he and the plaintiff were in their thirties and their two children were under nine and two years of age respectively. From the date of their marriage up to that time they had been a happy married couple, and he had been a good provider, so that they always had a comfortable home, attractive furniture, kept servants, lived well, entertained, and were able to take trips together. This evidence and the evidence, later mentioned in connection with other exceptions, about the effect of defendant's conduct upon the plaintiff mentally and physically does not satisfy us that the verdict for compensatory damages was excessive or that the admission of the quoted answer has injuriously affected the rights of the defendant.

We next have exceptions to the admission of evidence, and to the refusal of the court to strike out answers to questions, mainly relating to opinion testimony. While waiting with the defendant and another for Parker to attend an ice show the defendant wanted to telephone him and the plaintiff noticed defendant's "anxiety", "her impatience" and that she appeared "very agitated". She testified that Parker stayed out many nights very late, and came in from four to eight in the morning, and sometimes didn't come in until a day later. That this caused her concern and the effect upon her was such that she became very tired waiting up all night and very lonely and unhappy. That the further effect of his not coming home regularly was that she lost weight, had no sleep, became very nervous and she had a doctor's care. That she noticed the defendant's actions in regard to her husband, noticed her interest, her taking him aside and that there was great intimacy between them. That she noticed that the defendant was absorbed in him. That she noticed that her husband's appearance was abnormal, he was exhausted and had lip stick on his collar, he smelled as though he had been drinking and he looked very haggard. That the plaintiff visited her husband's room in the Gibson Hotel and noticed pictures of the defendant and Tina Thomson, women's gloves, perfume, cigarettes with lipstick on them, flowers. The defendant argues that this evidence relative to what the plaintiff noticed about how the

defendant appeared and acted and about how Parker appeared were inadmissible as opinions and conclusions, and that no proper foundation had been laid for its admission.

■ As a general rule witnesses are to state facts and not give their inferences or opinions; but this rule is subject to the exception that "where the facts are of such a character as to be incapable of being presented with their proper force to anyone but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed to a certain extent, to add his conclusion, judgment or opinion." *Bates* v. *Sharon*, 45 Vt 474, 481.

Under this exception to the rule, it is permissible for a witness to testify that a horse appeared tired, *State* v. *Ward*, 61 Vt 153, 181, 17 A 483; that a man appeared worried, *State* v. *Bradley*, 64 Vt 466, 470, 24 A 1053; that two persons were very intimate, *State* v. *Marsh*, 70 Vt 288, 299, 40 A 836; that a person was domineering, *Mathewson* v. *Mathewson*, 81 Vt 173, 185, 69 A 646, 18 LRANS 300; that there was nothing peculiar in one's talk or action, *In re Esterbrook's Will*, 83 Vt 229, 234, 75 A 1; the expression of the respondent's face and eyes, *State* v. *Felch*, 92 Vt 477, 486, 105 A 23; that the respondent was under the influence of intoxicating liquor, *State* v. *Hedding*, 114 Vt 212, 214, 42 A2d 438; that cattle were not strong, *State* v. *Persons*, 114 Vt 435, 438, 46 A2d 854. In this connection we quote *State* v. *Felch, supra*; "So too, it is held that a witness may testify that one spoke affectionately of another. *Appeal of Spenser*, 77 Conn 638, 60 A 289, that a respondent acted 'sneaky', *Com.* v. *Borsky*, 214 Mass 313, 101 NE 377; and that one was affectionate toward another, *McKee* v. *Nelson*, 4 Cow, NY 355, 15 Am Dec 384. And speaking generally, an ordinary observer may be allowed to state that one appeared pleased, angry, excited, insulting, affectionate, or the like. * * * * * The raising of an eyebrow, the waive of a handkerchief, or the flash of an eye may give character to an act otherwise too trivial to notice."

14

■ As to laying a foundation for the admission of this evidence it is not pointed out in what respect the witness could have stated more facts than she did. As to the use of the word "regularly," in the question asking if Parker was coming home regularly, objection was made upon another ground than that an opinion was asked for. When a reason is given when taking an exception no other reason will be considered on review. *State* v. *Teitle*, 117 Vt 190, 200, 90 A2d 562, and cases cited.

The defendant argues that what the plaintiff observed about her husband, his conduct, his hours, and the feminine articles in his hotel room does not establish that these matters were in any way connected with her, and that it was not evidence fit to be considered as a rational basis for inferring facts to be proved. From the evidence of the plaintiff and others as to how the defendant and Parker acted when together, the presence of her photograph in his room, and other evidence about the defendant's coming to his hotel room and her pursuit and entertainment of him, it could reasonably be inferred that the conduct of Parker and the feminine articles in his hotel room were connected with the defendant.

The defendant also excepted to questions calling for similar testimony from Mr. and Mrs. Grant Titsworth, long time friends and acquaintances of the plaintiff and Parker. Mr. Titsworth testified that he observed that the defendant and Parker "were decidedly on intimate terms". Previously he had testified to calling upon Parker at his room in the Gibson Hotel on a Saturday afternoon, and that while he was there the defendant came in and after a little suggested that they go out to dinner. After dinner, upon her invitation, he and Parker went to her house where they stayed over night and until the next evening. While there he saw Parker and the defendant sitting on a sofa arm in arm, and she called him "dear". When the witness undertook to stand up for the plaintiff the defendant stated that "she regarded Mrs. Parker as a silly, light-headed, rather absurd creature. She stated that she excepted to her relationship with Mr. Parker to marry him, and that consideration for Mrs. Parker was rather beside the point of what was important." Defendant's home was

that of her then husband, one Thomson. He was not present on the occasion referred to and the defendant told the witness that he had been living at the Cincinnati Country Club since she had commenced divorce proceedings.

On an earlier occasion before the plaintiff and Parker had first separated, Mrs. Titsworth, with the plaintiff and Parker and five other guests, attended a dinner at the home of the defendant at which Mr. Thomson was present. She was asked: "Can you describe for us the attitude of Mrs. Thomson toward Mr. Parker?" to which was added "during the course of that evening?", and she answered: "Well, they kept cozying off into the corners. I don't know how to say it." She was then asked what she observed of her conduct toward Parker, and how she acted, and she answered: "She was attracted by him." She was then asked: "Tell us what she did if you observed anything. If you didn't just tell us that?" and she answered: "She would separate herself and him from the rest of the group and talk together off in either a corner of one room or go into one of the other living rooms and be alone with him rather than with the rest of the guests". Having testified that she had known the plaintiff since their marriage, and that on the occasion of her visit at the Parkers' at the time of this dinner she had noticed a change in their relations toward one another, she was asked: "What change, if any, did you note?", and she answered: "Mr. Parker wasn't as kind and considerate as he had been before."

The exceptions along these lines are not sustained.

Exceptions were taken to questions asked witnesses who were acquainted with the plaintiff and her husband as to their observation of the physical and mental condition of the plaintiff before and after her husband became acquainted with the defendant. Exceptions were also taken to questions asked the plaintiff about the family life, the affection of her husband and the kind of provider he had been. Considerable testimony is set out in the brief and it is claimed generally that the evidence was inadmissible because calling for conclusions. These exceptions are not sustained. The rule stated in *Bates* v. *Sharon, supra,* applies.

It is claimed that certain similar testimony of Mr. and

Mrs. Titsworth was not only remote but pure speculation. It is pointed out that these witnesses, between the time when the Parkers had gone abroad in 1934, and the times late in 1944 and in 1945, when they had noted the changed relations between the plaintiff and Parker and the effect upon the plaintiff, had only seen the Parkers on two occasions, one in 1935 when they spent three or four evenings with the Parkers in their home in Paris, and one in 1940, when they entertained the Parkers in their home. It is pointed out that the Parkers were eleven years older, had lost a son, had been separated when Parker was away on business trips, had been close to war conditions, and that Parker had changed his occupation. It is argued that these things may explain the changed relations noted. No abuse of discretion as to remoteness in receiving this evidence is made to appear. Such circumstances may go to the weight of this evidence, but it is clearly not pure speculation. The defendant expressly calls our attention to a question asked Mrs. Titsworth. She was asked: "Tell us this, Mrs. Titsworth, as you observed the Parkers from the time they were married up until this occasion in Cincinnati, were they happy and normal people?" And she answered: "They were." Defendant says "Nothing could be more apparent than the fact that Mrs. Titsworth could make no such observation." We do not agree. It is further pointed out that certain unresponsive answers of witnesses were struck out, but the court did not advise the jury to disregard them. Our attention is not called to any exception of this nature. If error it was harmless.

In connection with the testimony of the plaintiff a number of telegrams and letters, which she testified she had received from Parker, were admitted in evidence for the purpose of showing the affection of Parker for the plaintiff as of the time each telegram and letter was sent. Some of these were sent early in their married life and the last was written a short time before Parker became acquainted with the defendant. They all show the same trend. The admission of these as exhibits was excepted to on several grounds, but we need notice only the grounds that are briefed, that the dates on the telegrams show that they are too remote in time to have any

bearing, that both telegrams and letters were incompetent, irrelevant and immaterial, and that because the plaintiff had testified to tearing up of various telegrams and letters received from her husband while this suit was pending, it would be prejudicial to permit them to appear in evidence.

 Our rule in actions of this kind is that it is relevant to inquire into the terms on which the husband and wife lived together before the entrance of the serpent into the garden of marital happiness, and it is usual to give evidence of what they have said or written to or of each other, in order to show their mutual demeanor and conduct, and whether they were living on good or bad terms. To guard against possible collusion, the law requires that the declarations and letters of the alienated spouse, to be admissible, must have been made or written before any trouble occasioned by the defendant arose; and prior to the existence of any facts calculated to excite suspicion of misconduct of the spouse who made or wrote them. *Fratini* v. *Caslani*, 66 Vt 273, 275, 29 A 252; *Button* v. *Knight*, 95 Vt 381, 384, 115 A 499; *Rasanen* v. *Viinamaki*, 103 Vt 323, 154 A 691; *Sargent* v. *Robertson*, 104 Vt 412, 420, 160 A 182.

 Under the foregoing rule the telegrams and letters were admissible as against the objections that are briefed. The question of remoteness was one that called for the exercise of the court's discretion. *Woodhouse* v. *Woodhouse*, 99 Vt 91, 119, 130 A 758; *State* v. *Lizotte*, 109 Vt 378, 384, 197 A 396. That a fact is remote in point of time or probative value, does not of itself preclude its admissibility. *Fairbanks* v. *Frank*, 107 Vt 45, 48, 176 A 294. If, as these exhibits tend to show, Parker had been an affectionate husband during all the time since his marriage to the plaintiff until he met the defendant, the telegrams had some probative value. An abuse of discretion in admitting them is not made to appear. Nor were these exhibits made inadmissible by the tearing up of other telegrams and letters from Parker. *Stone* v. *Sanborn*, 104 Mass 319. Nowhere does the defendant point out why she was not amply protected by the court's charge that the jury could presume that any destroyed letters and telegrams

were unfavorable to the claims of the plaintiff upon the point that those received in evidence were offered to prove.

At the close of all the evidence the defendant moved for a directed verdict on the ground, that viewed in the light most favorable to the plaintiff, she had not put in such evidence as is necessary to establish a prima facie case, and on other grounds not briefed. In her brief the defendant calls attention to the testimony of the plaintiff that Parker asked to come home and that she took him back, and that they lived together for a month in March and April, 1945, before he again left her. Defendant's brief then states: "The record is now clear that whatever alienation of affection took place prior to April, 1945, ceased and ended in April, 1945. This Court has indicated that there can be no action for such alienation of affection under such conditions because of the doctrine of condonation or consent." To this is cited *Oligny* v. *Underwood*, 116 Vt 193, 195, 198, 71 A2d 250. Her brief then raises the question as to whether where is any proof of a subsequent alienation of affection or criminal conversation. Since no question is raised about the sufficiency of the proof of alienation of affection and criminal conversation, prior to the time when the plaintiff took Parker back, we need spend no time in reviewing the evidence tending to show the same.

The only authority cited in support of defendant's theory of condonation is *Oligny* v. *Underwood, supra*. In that case the plaintiff and her husband first separated in 1942, when he turned over all his property to her and she said she didn't care what he did or whom he went with. In 1946 they went back to living together again and lived in peace and harmony for more than a year, when the defendant again intruded. The action is for the last intrusion. The defendant excepted to the failure of the court to charge that if the jury found the facts as indicated about the 1942 separation and that the plaintiff then consented to her husband's going around with the defendant there would be no alienation, and in holding that the defendant was not entitled to the instruction, we said that there was no consent by the plaintiff to what the defendant did after the parties were reconciled. In the case before

us we have no evidence of any consent, such as is referred to in the above mentioned case.

In *Frederick* v. *Morse*, 88 Vt 126, 133, 92 A 16, a suit by a wife for alienation of affection and criminal conversation, the defendant excepted to the failure to charge that if the plaintiff had knowledge of the adulterous disposition of the defendant and of her intent with Frederick, and then continued to live with him, that would operate as a condonement, and should at least go to mitigate damages. The refusal to give this instruction was held not to be error. This case supports the rule, stated in 27 Am Jur, Husband and Wife, §540, to be according to the weight of authority, that condonation and forgiveness by the husband, after knowledge that his wife has been guilty of criminal conversation, either expressly or by continuing to cohabit with her, do not extend to the forgiving of the wrong perpetrated by her seducer, and do not therefore preclude him from maintaining an action for criminal conversation against her seducer. We endorse this rule as applicable to an action for criminal conversation by the wife, except that it makes no difference whether the defendant was the seducer, or the seduced. *Miller* v. *Pearce*, 86 Vt 322, 327, 85 A 620, 43 LRANS 332. This case is also in line with the rule stated in §688, Rest. of Torts, that "the condonation or forgiveness by the husband of conduct of his wife which constitutes cause for divorce does not bar his recovery for invasions by another of any of his legally protected marital interests." We also endorse this rule as applicable to an action by the wife for alienation of her husband's affections, and to an action by her for criminal conversation.

We hold that the fact that the plaintiff took her husband back and lived with him a month does not bar her recovery of damages for alienation of his affection and criminal conversation occurring prior thereto. This holding makes it unnecessary to discuss the question raised relative to the proof of any subsequent misconduct. There is some question about the sufficiency of the ground of the motion for a directed verdict to raise the question briefed, but, however that may be, the motion was properly denied.

Under her exceptions to the charge, to the failure to charge as requested, and to the denial of her motion to set aside the verdict as excessive the defendant insists that there was no evidence which would permit the jury to award exemplary damages, and that the plaintiff offered no evidence whatever of the financial worth of the defendant. In her brief our attention is called to two statements in *Woodhouse* v. *Woodhouse*, 99 Vt 91, on pages 140 and 155, 130 A 758, pages 781 and 788, respectively, as follows:

> "On the question of exemplary damages, it was incumbent upon the plaintiff to show the actual means of the defendants. *Rea* v. *Harrington*, 58 Vt 181, 188, 2 A 475, 56 AR 561."
> "In determining what would be a just punishment, there must be taken into account the character and standing of the defendants [*Goldsmith's Admr.* v. *Joy*, 61 Vt 488, 17 A 1010, 4 LRA 500, 15 ASR 923], the malice or wantonness of the act for which they are found guilty [*Boardman* v. *Goldsmith*, 48 Vt 403], as well as the financial standing of the least wealthy defendant."

 With us, exemplary damages are allowed in enhancement merely of ordinary damages, on account of the bad spirit and wrong intention of the defendant manifested by the act. *Hoadley* v. *Watson*, 45 Vt 289, 292. The propriety of their allowance depends wholly upon the malice or wantonness of the defendant. *Moore* v. *Duke*, 84 Vt 401, 408, 80 A 194. The primary purpose of evidence of the financial condition of the defendant on the question of punitive damages is to ascertain his ability to respond in such damages. *Woodhouse* v. *Woodhouse*, *supra*, 99 Vt 138, 139.

 The holding of *Rea* v. *Harrington*, *supra*, is that a defendant has a right to show that he has no means on the question of exemplary damages, even though the plaintiff offered no proof to show, and claimed no damages by reason of the defendant's means. That case points out that ability

to pay is a proper element for consideration, but it does not say that proof of actual means is essential to the recovery of exemplary damages. No Vermont case has been called to our attention that so holds. The statement in *Rea* v. *Harrington, supra,* that the defendant's pecuniary ability must be considered in order to determine what would be a just punishment for him, merely means that whether or not he has property, and if he has property the amount thereof, must be considered. The statement quoted from *Woodhouse* v. *Woodhouse, supra,* that it was incumbent upon the plaintiff to show the actual means of the defendants, merely means that where, as in that case, the plaintiff seeks to have the defendant's wealth considered in arriving at the amount of exemplary damages, only such wealth as his evidence fairly and reasonably tends to show may be considered.

In this case there was evidence that the defendant owned a house on 74th Street in New York City, a house in Seager, New York, and a house in Woodstock, Vermont, which Parker had transferred to her after the defendant had given him three or four thousand dollars to buy the plaintiff's half interest therein, and which sum Parker had paid for such interest. There was no evidence of the value of these three houses at the time of the trial as in *Miller* v. *Pearce,* 86 Vt 322, 85 A 620, 43 LRANS 332, but the price paid for one-half the Woodstock house at some time after his marriage to the defendant in May, 1946, was evidence of the value of that half at the time of its purchase, *Fenwick* v. *Sullivan,* 102 Vt 28, 30, 145 A 258, and such time was recent enough to afford a fair indication of its value at the time of the trial without taking into consideration the current general rise in value of real estate. Since Parker and the defendant lived in the New York city and Seager houses and they were persons of considerable social standing, the fair inference is that these houses had considerable value. On the whole we have a situation somewhat like that presented in *Hargraves* v. *Ballou,* 47 RI 186, 131 A 643, 647, an alienation case, where the defendant was shown to own two houses, two automobiles, a radio, a pianola and a diamond ring, but no evidence of their value was in-

troduced. The question presented was whether such evidence warranted an award of substantial punitive damages. It was held that it did, stating: "Where punitive as well as compensatory damages may be awarded, and there is evidence of defendant's real or reputed wealth, stated in terms of property or prospects, the jury may determine what amount of damages should be awarded as punishment. Defendant is always in a position to protect himself against erroneous inferences by showing the actual facts." We are not concerned with reputed wealth, but only with actual means under our decisions. The defendant did not attend the trial and could not be cross-examined as to her means. That the defendant was not penniless is shown by her ownership of the three houses. She was, however, in a position to protect herself against erroneous inferences by showing the actual facts. We think enough was shown to warrant an award of substantial exemplary damages. These exceptions are overruled.

█ The defendant requested the court to charge, that "each juror must be satisfied in his own conscience as to the facts of this case and should not compromise or agree with other jurors if his or her determination differs from that of other jurors," and excepted to its denial. Standing alone the requested instruction would have a tendency to restrain the jurors from agreement on a verdict. Although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his fellows, yet it by no means follows that opinions may not be changed in the jury room. The single object to be there effected is to arrive at a true verdict; and this can only be done by deliberation, mutual concession, and a due deference to the opinions of each other. By such means and such only, in a body where unanimity is required, can safe and just results be attained; and without them, the trial by jury, instead of being an essential aid in the administration of justice, would become a most effectual obstacle to it. *Com. v. Tuey*, 8 Cush, Mass, 1; *Allen* v. *United States*, 164 US 492, 17 S Ct 154, 41 L ed 528. This exception is overruled.

Throughout her brief the defendant insists that the jury was prejudiced by improper comment, improper evidence and

irresponsive answers to questions, and she says that the trial was conducted in an atmosphere of prejudice, and that the size of the verdict indicated that the jury was improperly influenced. After a review of all the questions raised no prejudicial error has been made to appear.

*Judgment affirmed.*