2008 VT 25

**Kaveh Shahi and Leslie Shahi v. Daniel Madden**

[949 A.2d 1022]

No. 06-412

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Pearson, Supr. J., Specially Assigned**

Opinion Filed March 7, 2008

---

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, for Plaintiffs-Appellees.

*David W. Reeves* of *Wright, Reeves & Vollers, P.L.C.*, Woodstock, for Defendant-Appellant.

¶ 1. **Skoglund, J.** In this case, the jury found that plaintiffs, Kaveh and Leslie Shahi and their children, had been the victims of a vicious campaign of harassment at the hands of defendant, their neighbor. The evidence was uncontested that, after plaintiffs refused defendant's demand to remove an approximately 100-year-old tree located on their shared property line, defendant waged an offensive of intimidation and vandalism that took a large personal and financial toll on plaintiffs. Defendant, Daniel Madden, appeals from a judgment awarding plaintiffs more than $1,800,000 in

damages. Defendant argues that the court erred when it: (1) granted plaintiffs' motion to amend the complaint on the eve of trial, (2) denied defendant's motion for a view of the premises by the jury, (3) precluded the admission of evidence of defendant's financial status, (4) incorrectly calculated damages, and (5) denied defendant's motion for a new trial or to remit as excessive a portion of the damages. We affirm the judgment below in all respects.

¶ 2. The facts that follow are uncontested. In 2002, defendant acquired a ten-acre parcel of land abutting the plaintiffs' residence in Woodstock, Vermont. That fall, defendant demanded that plaintiffs give him permission to remove an approximately 100-year-old tree located on the shared property line. In July 2003, after plaintiffs had refused to give defendant permission to do so, and while plaintiffs were out of town, defendant cut down the tree. Plaintiffs brought a law suit against defendant and his spouse for the unlawful cutting of the tree; defendant and his spouse resisted discovery and settled for $5,000 in October 2004. Shortly after the settlement, plaintiffs discovered a mature tree — located on their property near where the first tree had been cut — that had been "girdled." According to plaintiffs' expert, girdling is making a "penetrating cut through (or remov[ing] . . .) the bark from the circumference of a tree," and is "[a]n accepted forestry practice to kill an unwanted tree." In November 2004, plaintiffs filed suit against defendant seeking punitive and other damages, interest and costs for timber trespass, unlawful trespass and unjust enrichment. This second suit would eventually become the subject of this appeal.

¶ 3. Defendant's campaign of vandalism did not stop there. In September 2005, plaintiffs discovered that one of their trees had been cut and was lying across the driveway, blocking access to their house. On the same day, plaintiffs discovered two additional mature, girdled trees along the boundary line with defendant's property. Plaintiffs contacted the State Police; subsequent investigations turned up a number of other similarly damaged trees on plaintiffs' property. In October 2005, defendant was arrested for vandalism of plaintiffs' property. Within a few days of defendant's arrest and release, plaintiffs discovered more girdled trees on their property. Defendant was arraigned on felony and misdemeanor charges (felony unlawful mischief in violation of 13 V.S.A. § 3701(a) and unlawful trespass in violation of 13 V.S.A. § 3705(a)),

and, one week later, plaintiffs' family dog exhibited symptoms of poisoning and died. In November 2005, plaintiffs' bird feeder was vandalized, and plaintiffs learned from a neighbor that defendant had earlier stated that he disliked plaintiffs because he perceived them as non-Christians and that he wanted plaintiffs to relocate. He also told this neighbor that he intended to shoot plaintiffs' dog. Among other things, garbage, sharp objects and bullets were placed on plaintiffs' driveway and in their yard, plaintiffs' vehicle was "keyed," and plaintiffs were subjected to loud noises. Plaintiff Leslie Shahi testified that her family had been living in an atmosphere of terror since the fall of 2005.

¶ 4. On January 3, 2006, plaintiffs filed a motion for leave to amend their complaint by adding defendant's wife as a defendant, to apply their original causes of action against defendant ((1) timber trespass, (2) unlawful trespass and (3) unjust enrichment) with regard to twenty-four trees, and to allege additional causes of action against defendant, seeking punitive and other damages as well as injunctive relief, attorney's fees, interest and costs for (4) "intimidation . . . threat . . . and harassment . . . intended to . . . deprive and discourage plaintiffs from access to . . . [c]ourt and the ability to pursue their legal rights," (5) unlawful mischief in violation of 13 V.S.A. § 3701, (6) unlawful removal and/or alteration of boundary stakes in violation of 13 V.S.A. § 3834, (7) commission of hate crimes in violation of 13 V.S.A. §§ 1455-1457, (8) stalking and aggravated stalking in violation of 13 V.S.A. §§ 1062-1063, and (9) extortion in violation of 13 V.S.A. § 1701.[1] During a status conference on January 9, 2006, the court declined to rule on the motion to amend until such time as defendant's spouse could be deposed. To safeguard defendant's Fifth Amendment right, the court precluded defendant from being deposed while the criminal charges were pending. It was agreed that this case would be tried after the conclusion of the criminal trial. The court approved a discovery schedule and alerted the parties that they would be required to go forward with the trial by June 15. Discovery proceeded, including expert disclosures and a site inspection by defendant's expert of all the damaged trees. In June 2006, defendant entered a no-contest plea to a misde-

---

[1] In a supplemental memorandum in support of their motion for leave to amend the complaint dated April 19, 2006, plaintiffs styled their eighth cause of action as "Invasion of Privacy/Stalking."

meanor in the criminal case. At a pretrial conference in this case on July 5, 2006, plaintiffs withdrew their motion to add defendant's spouse as a defendant, and the court granted plaintiffs' motion to amend with respect to all claims made against defendant in plaintiffs' amended complaint.

¶ 5. A jury trial was held on July 12 and 13, 2006 at which defendant chose not to appear. At trial, defense counsel did not deny liability but attempted to mitigate damages by eliciting testimony from an expert witness and by cross-examining plaintiffs' witnesses. The jury found defendant liable on all counts charged and awarded $100,000 in damages for timber trespass, $255 for common law trespass, $5,000 for unlawful mischief, $1,000 for unlawful removal of survey stakes, $500,000 for invasion of privacy and $1,000,000 in punitive damages. The court trebled the timber-trespass damages to $300,000 pursuant to 13 V.S.A. § 3606. Defendant filed a timely motion for a new trial or for remittance of that part of the award corresponding to invasion of privacy and punitive damages as excessive. That motion was denied, and this appeal ensued.

## I. Motion to Amend

¶ 6. Defendant first argues that the trial court erred when it granted plaintiffs' motion to amend the complaint on July 5, 2006. We review a trial court's decision to grant a motion to amend the complaint for abuse of discretion. *Lillicrap v. Martin*, 156 Vt. 165, 170, 591 A.2d 41, 44 (1989). The trial court did not abuse its discretion here.

¶ 7. Vermont Rule of Civil Procedure instructs the trial courts that "leave shall be freely given" to amend pleadings "when justice so requires." V.R.C.P. 15(a). We have recently directed trial courts to allow amendments to pleadings "when there is no prejudice to the objecting party, and when the proposed amendment is not obviously frivolous nor made as a dilatory maneuver in bad faith." *Hunters, Anglers & Trappers Ass'n of Vt., Inc. v. Winooski Valley Park Dist.*, 2006 VT 82, ¶ 17, 181 Vt. 12, 913 A.2d 391 (quotation omitted). Defendant does not claim that plaintiffs' long-standing motion to amend the complaint was frivolous or dilatory. Rather, the crux of defendant's argument is that he was unfairly prejudiced by the trial court's granting of the motion one week before trial was scheduled to have taken place. We disagree.

Plaintiffs' motion to amend the complaint was made more than six months before trial and was sufficiently detailed to have put defendant on notice as to plaintiffs' new factual averments and legal arguments. In addition, the record reveals that both parties proceeded with discovery and pretrial motion practice as if the amendments would be granted in due course. For example, defendant propounded supplemental interrogatories and requests for production referencing the amended complaint. Finally, we note that defendant failed to move for a continuance once the court granted plaintiffs' motion to amend. See *Perkins v. Windsor Hosp. Corp.*, 142 Vt. 305, 314, 455 A.2d 810, 816 (1982) ("Any surprise engendered by allowance of the proposed amendment could have been eliminated by requesting a continuance of the trial."). There was no abuse of discretion here.

## II. Motion for a View of the Premises

¶ 8. Defendant's second assignment of error was that the trial court abused its discretion when it denied defendant's motion for a view of the premises by the jury. Trial courts may allow the jury to view premises where necessary in actions for damages to real estate. 12 V.S.A. § 1948. And "we are bound to indulge every reasonable presumption in favor of the [trial court's ruling], bearing in mind that the trial court was in a better position to determine the question" of necessity. *Viens v. Lanctot*, 120 Vt. 443, 448, 144 A.2d 711, 715 (1958). The trial court denied defendant's pretrial motion for a view on the grounds that it would not be helpful to the jury. When the defendant renewed the motion in open court, the court again denied the request and explained to the jury that the court had decided against it for logistical reasons. During the bench conference that immediately followed, the court told the parties that it was "stay[ing] by [its pretrial] ruling."

¶ 9. The thrust of defendant's argument is that the court abused its discretion in relying on logistical considerations to deny defendant's motion for a view. As it is clear on the record that the court denied defendant's motion initially, and at trial, based on its determination that it would not help the jury decide the case, defendant's argument is unavailing. The balance of defendant's claim is his conclusory statement — unsupported by citation to legal authority — that "a view of the premises is intrinsic to a

claim for aesthetic loss to real estate." Defendant's theory is that trial courts are in error whenever they preclude jury views of premises where aesthetic loss to real estate is at issue "so long as that can be done without undue burden." The statutory language does not support defendant's position. See 12 V.S.A. § 1948 (*"When on the trial of a cause . . . for damages to real estate . . . it is necessary* that a view be had of the premises . . . *the court may grant* such view . . . ."* (emphasis added)). At trial, plaintiffs submitted numerous photographs of the trees and the property as evidence before defendant renewed his motion. The court's discretionary judgment that a view was not necessary is sustainable.

## III. Evidence of Defendant's Finances

¶ 10. Next, defendant argues that the court erred when it allowed the issue of punitive damages to go to the jury without there having been admitted any evidence as to defendant's financial ability to pay a punitive damage award. As it appears that defendant's argument is one of law, we will proceed with de novo review. See *Vt. Alliance of Nonprofit Orgs. v. City of Burlington*, 2004 VT 57, ¶ 5, 177 Vt. 47, 857 A.2d 305.

¶ 11. We have never held that proof of a defendant's actual means is essential to the recovery of punitive damages. See *Parker v. Hoefer*, 118 Vt. 1, 20-21, 100 A.2d 434, 446-47 (1953). We have held only that such proof is *relevant* to the calculation of punitive damages. *Lent v. Huntoon*, 143 Vt. 539, 550, 470 A.2d 1162, 1170 (1983). Defendant nonetheless claims that because plaintiffs' counsel (in his opening statement) and plaintiff Leslie Shahi (on direct examination) referred to defendant as "wealthy," it was unfair to submit the punitive damages question to the jury without "admit[ting] evidence of [d]efendant's financial standing." We disagree.

¶ 12. The record reveals that defendant did not proffer any evidence as to defendant's actual financial means, but rather that defense counsel attempted to establish defendant's lack of wealth by cross-examining one of plaintiffs' witnesses. In addition, defense counsel failed to object to any of plaintiffs' counsel's references to defendant as a "wealthy businessman," the court struck plaintiff Leslie Shahi's statement as to defendant's wealth upon defense counsel's hearsay objection, and plaintiffs' counsel elicited testimony and made statements in his closing remarks

tending to clarify that defendant's financial status was unknown to plaintiffs. The trial court found that plaintiffs' attorney diligently and thoroughly sought discovery as to defendant's finances but that defendant failed to produce much of the information sought. The court noted that "to rule otherwise would give incentive for defendants to hide assets, to not produce the [financial] material in order to avoid a punitive claim." Under the circumstances, it was not unfair, nor was it error, for the trial court to submit the issue of punitive damages to the jury absent additional evidence as to defendant's financial standing.

## IV. Timber Trespass Damages

¶ 13. After the trial court entered judgment on the jury's verdict, defendant filed a motion for a new trial or amendment of the judgment on the grounds, inter alia, that the jury's $100,000 compensatory-damages award for timber trespass was unsupported by the evidence and that the trial court therefore erred in trebling the award pursuant to 13 V.S.A. § 3606. Defendant's fourth argument on appeal is that the trial court erred when it denied defendant's motion. Defendant claims the evidence demonstrated that only one tree was "destroy[ed]" within the meaning of the statute and that it had a value of $4,070. Defendant's argument requires us to decide both whether the jury's $100,000 compensatory-damages award for timber trespass was supported by the evidence and when a tree is "destroy[ed]" within the meaning of § 3606. We will address both issues in turn.

¶ 14. The law favors upholding jury verdicts. Whether to grant a motion for a new trial is a question left to the sound discretion of the trial court. *Irving v. Agency of Transp.*, 172 Vt. 527, 528, 768 A.2d 1286, 1288-89 (2001) (mem.); *State v. Martel*, 164 Vt. 501, 505, 670 A.2d 845, 848 (1995). However, when considering a motion for a new trial, the trial court must "weigh the evidence in the light most favorable to the verdict." *Hardy v. Berisha*, 144 Vt. 130, 133, 474 A.2d 93, 95 (1984); see also *Irving*, 172 Vt. at 527, 768 A.2d at 1288. We review the trial court's denial of defendant's motion for a new trial for abuse of discretion. *Irving*, 172 Vt. at 528, 768 A.2d at 1289. On appeal from a denial of a new trial motion, we are also required to view evidence in the light most favorable to the nonmoving party and disregard the effect of modifying evidence. *Id.* at 527, 768 A.2d at 1288. "[W]hen

a party appeals a court's refusal to . . . grant a new trial on the grounds that the jury's verdict is not supported by the evidence, we need only determine whether the jury could reasonably have found its verdict for damages on the evidence before it." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 127, 730 A.2d 1086, 1094 (1999) (quotations omitted).

¶ 15. Viewed in the light most favorable to plaintiffs, the evidence before the jury concerning the condition of the trees was as follows. Plaintiffs' expert's initial conclusion was that, out of the twenty-four trees damaged, twenty-two would probably die prematurely as a result of the girdling, one would probably live, and one tree — a large, White Pine — was about as likely to live as it was to die. Plaintiffs' expert communicated these prognoses to plaintiffs via a report, dated November 21, 2005, which was in turn submitted to the jury as evidence. In the report, plaintiffs' expert indicated the trees' likelihood of survival by assigning a "future condition" rating to each tree. Each tree's prognosis was expressed (usually by a range of numbers) on a scale from zero to ten. Plaintiffs' expert testified that the zero rating corresponded to certain death, and that a rating of ten would attach to a tree for whose recovery from girdling the expert was "most hopeful." The expert's testimony also indicated that a tree whose average future condition rating was less than five would die. The expert assigned to twenty-two trees an average rating of less than five, and to one tree, number thirteen — the large, White Pine — an average rating of five. Plaintiffs' expert testified that he was less optimistic about the prospects of tree number thirteen upon revisiting the site on the eve of trial. The expert did not rate the twenty-fourth tree but described it as in "vigorous health." Given this evidence, the jury could have concluded that twenty-three out of the twenty-four trees would die prematurely as a result of the girdling.[2]

---

[2] Defendant's argument fails principally because it requires that the jury have credited defendant's expert over plaintiffs'. Defendant's expert testified that plaintiffs' expert's ratings were normative as opposed to predictive; that is to say that a tree would only die as a result of the girdling if its "future condition" rating was a zero, and that trees that were given a low rating would survive but be in a bad condition. Therefore, defendant argues on appeal that, taking the evidence in the light most favorable to plaintiffs, only those trees whose "future condition" rating-range included a zero were destroyed within the meaning of the statute. The only tree that was both valued by plaintiffs' expert and whose rating-range

¶ 16. Evidence was admitted as to the values of only three out of those twenty-three trees. Plaintiffs' expert valued a Norway Spruce with a diameter of fifteen inches at $9,100 and a thirteen-inch White Pine at $4,070. In his report, plaintiffs' expert valued the sixty-inch White Pine, tree number thirteen, at $85,000. There are various ways the jury could have approached the valuation of these trees. Because there was ample evidence from which the jury could have estimated the value of the twenty other trees likely to die to be $2,000 or greater, their verdict is sustainable. Plaintiffs' expert furnished the jury with each of the twenty-three trees' diameters, probable condition before girdling, species, and value relative to placement on plaintiffs' property as well as his formula for valuation. Plaintiffs' expert also testified generally as to the relative value of some of the species represented as well as how the aforementioned factors figured into the value of a tree. The jury could have reached a $100,000 compensatory-damages award without resorting to unreasonable extrapolation on the basis of the evidence before it.

■ ¶ 17. Difficulty in calculating damages with precision does not defeat a jury award, see *Brueckner*, 169 Vt. at 128, 730 A.2d at 1094 ("The difficulty of precise computation of the losses plaintiff has and will continue to incur . . . is not a ground to reverse a lost earnings award."); *Retrovest Assocs. v. Bryant*, 153 Vt. 493, 496-97, 573 A.2d 281, 283 (1990) ("[d]ifficulty in computing damages does not preclude the jury from making an assessment" (quotation omitted)); we uphold damages calculations that require extrapolation by the jury. See, e.g., *Trombley v. Sw. Vt. Med. Ctr.*, 169 Vt. 386, 398-99, 738 A.2d 103, 112 (1999) (upholding damages award exceeding plaintiff's highest estimate where jury could have applied formula for ascertaining backpay to period of time unaccounted for by estimate). Litigants are not required to "present precise figures of damages," *Waterbury Feed Co. v. O'Neil*, 2006 VT 126, ¶ 27, 181 Vt. 535, 915 A.2d 759 (mem.), and juries are routinely asked to make far more difficult calculations on the basis of far less certain information than at issue in this case. See, e.g., *Brueckner*, 169 Vt. at 128, 730 A.2d at 1094 (upholding jury verdict for lost earnings capacity); *Debus v. Grand Union Stores*

included a zero was valued at $4,070; hence, defendant's argument. However, it goes without saying that the jury was entitled to believe plaintiffs' expert's own interpretation of his rating system over that of defendant's expert.

*of Vt.*, 159 Vt. 537, 539-42, 621 A.2d 1288, 1290-91 (1993) (upholding jury's pain and suffering award). We must sustain the jury's award as long as trees that will die prematurely as a result of girdling are "destroy[ed]" within the meaning of the timber-trespass statute. We conclude that they are.

¶ 18. Vermont's timber-trespass statute, 13 V.S.A. § 3606, provides as follows:

> If a person cuts down, destroys or carries away any tree or trees placed or growing for any use or purpose whatsoever, or timber, wood, or underwood standing, lying or growing belonging to another person, without leave from the owner of such trees, timber, wood, or underwood, or cuts out, alters or defaces the mark of a log or other valuable timber, in a river or other place, the party injured may recover of such person treble damages in an action on this statute. However, if it appears on trial that the defendant acted through mistake, or had good reason to believe that the trees, timber, wood, or underwood belonged to him, or that he had a legal right to perform the acts complained of, the plaintiff shall recover single damages only, with costs.

¶ 19. In interpreting the statutory language, " 'our principal objective is to implement [the] legislative intent' behind the statute." *State v. Singer*, 2006 VT 46, ¶ 10, 180 Vt. 104, 904 A.2d 1184 (quoting *In re Hinsdale Farm*, 2004 VT 72, ¶ 5, 177 Vt. 115, 858 A.2d 249). We presume that the Legislature "intended the plain, ordinary meaning of the language," *Town of Hinesburg v. Dunkling*, 167 Vt. 514, 525, 711 A.2d 1163, 1169 (1998), and "will enforce the plain meaning of the statutory language where the Legislature's intent is evident from it." *In re Carroll*, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990 (citing *Wesco, Inc. v. Sorrell*, 2004 VT 102, ¶ 14, 177 Vt. 287, 865 A.2d 350).

¶ 20. Certainly, killing something is ordinarily understood as an act of destruction, see The American Heritage College Dictionary 378 (3d ed. 2000) (listing "[t]o kill" as one definition of destroy), and defendant does not argue otherwise. Rather, defendant argues that a "literal" reading of the statute permits trebling damages only for the trees that were already dead at the time of trial. We will not read the statute in such a cramped manner. Plaintiffs' expert testified that death-by-girdling is "a slow pro-

cess," and that it could take "years" for girdled trees to die, especially if they are large. To ask injured parties to forego compensation until such time as every one of their doomed trees has dropped its final leaf would be absurd. Cf. *Craw v. Dist. Court of Vt.*, 150 Vt. 114, 119, 549 A.2d 1065, 1069 (1988) ("A presumption obtains against a construction that would lead to absurd results."). Moreover, plaintiffs' expert made it clear that even a tree that survived girdling would "not be a nice tree anymore," and that "half of [the tree] could die," one of the "defense mechanisms of a tree [being] to actually let portions of the tree die to compensate for the lack of food . . . [o]r water." In light of this testimony, we hold that, at the very least, trees that are expected to die as a result of girdling are destroyed within the meaning of § 3606.

¶ 21. Our conclusion makes sense in light of what we have already said about the Legislature's purpose in drafting § 3606. This Court has had occasion to consider " 'the entire statute, including its subject matter, effects and consequences,' " in the past. *Singer*, 2006 VT 46, ¶ 10 (quoting *Hinsdale Farm*, 2004 VT 72, ¶ 5). We have long ruled that the treble-damages provision furthers the purpose of fully compensating wronged parties — a primary purpose of § 3606. *Singer*, 2006 VT 46, ¶ 10; *Guild v. Prentis*, 83 Vt. 212, 217, 74 A. 1115, 1118 (1910). We have recognized that full compensation for the cutting of trees requires the reimbursement of costs associated with "erosion, pollution . . . numerous other injuries to the land" and "comfort and aesthetic value" in addition to the value of the trees cut. *Singer*, 2006 VT 46, ¶ 10 (quotation omitted). According to plaintiffs' expert, three of the girdled trees had already died at the time of trial. Evidence was presented to show that plaintiffs will also incur the considerable cost of safe removal of dead and dying trees as time progresses. Holding that defendant's actions destroyed plaintiffs' trees in this case is therefore in line with the statutory goal of full compensation.

¶ 22. We have also recognized that the treble-damages provision was meant as a deterrent to both intentional trespass and the wrongful taking of another's timber. *Stanley v. Stanley*, 2007 VT 44, ¶ 10, 181 Vt. 527, 928 A.2d 1194; *Singer*, 2006 VT 46, ¶ 11. Defendant's intentional, repeated and malicious trespasses are at the heart of the plaintiffs' case, here. It is therefore

consistent with legislative intent to impose the treble-damages provision on defendant. That he did not actually take the timber is of no consequence. See *Singer*, 2006 VT 46, ¶ 14 ("§ 3606 provides for treble damages regardless of whether a person cuts down and carries away the trees . . . or simply cuts them down and leaves them . . . even though [t]he net result to the landowner may be substantially different depending on which course the wrongdoer takes" (quotation omitted)).

## V. Invasion of Privacy and Punitive Damages

¶ 23. In his motion for a new trial or to amend the judgment, defendant moved for the trial court to remit as excessive the jury's $500,000 invasion-of-privacy and $1,000,000 punitive-damages awards. Defendant's fifth contention on appeal is that the trial court erred by denying his motion to remit. Remittitur is within the sound discretion of the trial court, and its ruling will not be set aside on appeal absent abuse of discretion. *Lent*, 143 Vt. at 553, 470 A.2d at 1172. "Unless grossly excessive, this Court will not interfere with an award of damages" in a case like this one "where exact computation is impossible." *Id.*

¶ 24. Defendant fails to advance any argument whatsoever as to why the $500,000 compensatory-damages award was excessive. Neither, based both on our review of the record and our limited standard of review, do we see any reason to disturb the jury's award or the trial court's judgment on remittitur. Defendant systematically terrorized plaintiffs' family by conduct that escalated from placing garbage and then sharp objects on plaintiffs' driveway, to monitoring plaintiffs' house by parking at early morning hours in their driveway, "keying" their car while parked at their home, placing harassing phone calls to their house, attempting identity theft, placing live bullets on plaintiffs' yard, poisoning the family dog, and vandalizing bird feeders placed close to their house. Defendant was undeterred by the presence of law enforcement; his behavior escalated even after his arrest. As such, plaintiffs are living as if under siege. They have installed a security system at their home and have armed themselves. They are constantly vigilant when defendant fires weapons on his property. They struggle to comfort their young daughter who has nightmares. We therefore uphold the jury's $500,000 compensatory-damages award; plaintiffs' sense of peace and privacy in their home has been destroyed by defendant.

■ ¶ 25. Defendant argues that the jury's punitive-damages award was so excessive as to constitute a violation of due process. Punitive-damage awards are subject to constitutional scrutiny because due process demands "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). The United States Supreme Court has recently articulated the constitutional limitations on punitive-damages awards in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). In *State Farm*, the Court directed courts to consider three guideposts when reviewing punitive damage awards:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

538 U.S. at 418. This case is neither a close nor a difficult one; none of these signposts favor defendant.

■ ¶ 26. "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 419 (quotation omitted). Reprehensibility is to be determined by reference to whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* Defendant concedes that his conduct was reprehensible, and specifically that it was malicious and involved repeated actions. Defendant nevertheless argues that this factor weighs in his favor because the "conduct was directed against the property of the [p]laintiffs . . . . [and] did not involve physical contact nor physical harm." We reject defendant's argument as specious; defendant's actions were directed against plaintiffs. The record supports a finding that defendant waged a campaign of terror against plaintiffs motivated in part by sectarian and racial bias. Such actions are among the most invidious and reprehensible known to our society — in Vermont, they are

subject to criminal sanction, see 13 V.S.A. § 1455 (providing for sentence enhancements for crimes motivated by victim's actual or perceived race, religion or national origin) — and as such certainly support punitive-damages awards. Cf. *Pion v. Bean*, 2003 VT 79, ¶¶ 34, 42, 176 Vt. 1, 833 A.2d 1248 (upholding punitive-damages award in an invasion-of-privacy case where harassing neighbor "motivated by [a] malicious plan to drive [the victims] from their home" though not by invidious bias).

¶ 27. With regard to the second factor, the punitive damage award of $1,000,000, as a multiple of the $500,000 compensatory-damages award, is on the low end of the range of single-digit ratios recognized by the United States Supreme Court as presumptively within the bounds of due process. *State Farm*, 538 U.S. at 425. While defendant concedes this, he argues that the compensatory-damages figure must have been inflated by the jury's desire to punish defendant, a consideration "duplicated in the punitive award." We disposed of defendant's compensatory-damages argument above. Moreover, the record reflects that appellant did not object to the compensatory- or punitive-damages charges, and as such has waived any argument as to instructions on measure of damages. *Trombley*, 169 Vt. at 395, 738 A.2d at 110. Defendant also argues that the two-to-one ratio is unreasonable and disproportionate because defendant "failed to appear and the jury was led to believe that he was a wealthy man, presumably with the means to pay such a huge sum." We have already noted that defendant failed to proffer any evidence as to his financial status or produce much of the information that was sought by plaintiffs regarding his finances during discovery. And while defendant had the right not to appear at trial, he did so at his own peril; we will not intervene by upsetting a valid and final judgment to save him from his tactical mistakes, if indeed that is what they were.

¶ 28. Finally, we evaluate the disparity, if any, between the punitive-damages award and the civil penalties authorized or imposed in comparable cases. Defendant points out that in *Pion*, a case in which a homeowner counterclaimed for invasion of privacy when his neighbor filed an action to quiet title, the trial court awarded only $30,000 in punitive damages. 2003 VT 79, ¶ 45. While defendant correctly cites the facts of that case, we do not find them comparable to the one at bar. Not only was the invasion of privacy at issue in *Pion* not motivated by sectarian or racial

bias, but it also did not apparently rise to a level at which the victim-homeowners sought fit to file suit, as plaintiffs here did not once but thrice. Neither plaintiffs nor defendant point to any other ostensibly comparable case in our jurisdiction, nor can we find any. As there is apparently no disparity to evaluate, we conclude that this factor weighs neither for nor against defendant. This, in addition to our analysis on the first and second guideposts, leads us to conclude that defendant was on sufficient notice for purposes of due process "not only [that] the conduct [would] subject him to punishment, but also of the severity of the penalty that [the] State [might] impose," *Gore*, 517 U.S. at 574, to uphold the jury's award of $1,000,000 in punitive damages.

*Affirmed.*