Vladyka v. Marsh, No. 266-4-09 Rdcv (Cohen, J., Mar. 31, 2010)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT
# RUTLAND COUNTY

|  |  |  |
|---|---|---|
| | ) | |
| **JAMES VLADYKA,** | ) | **Rutland Superior Court** |
| | ) | **Docket No. 266-4-09 Rdcv** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **AUDREY MARSH,** | ) | |
| **THOMAS BEZIO,** | ) | |
| | ) | |
| **Defendants,** | ) | |

## FINDINGS OF FACT, CONLUSIONS OF LAW, and ORDER

Plaintiff James Vladyka seeks to evict defendants Audrey Marsh and Thomas Bezio from the mobile home and land he rents to them because of late payment of rent and accumulation of garbage on the premises. He also seeks back rent and interest. Defendants have counterclaimed, alleging a breach of the warranty of habitability and retaliatory eviction stemming from the defendants' complaint to state officials about a sewage problem. They seek compensatory and punitive damages. A trial was held on August 5, 2009. Plaintiff was represented by John J. Welch, Esq. Defendants were represented by Kevin M. Volz, Esq.

## FINDINGS OF FACT

(1)     James Vladyka is the owner of land and a mobile home located at [address redacted], Benson, Vermont.

(2)     In September 2006, Audrey Marsh and Thomas Bezio began renting the home from Mr. Vladyka.

(3)     Ms. Marsh has children who live in the household.

(4)     Ms. Marsh and Mr. Bezio pay $495.00 a month for rent.

(5)     At the time Ms. Marsh and Mr. Bezio moved in there was a large accumulation of trash and junk on the property, immediately surrounding the mobile home.

(6)     This trash and junk included an old boat filled with trash, old mattresses half-buried in the ground, an old rusted hot water heater, an old refrigerator with food still inside of it, broken glass, old tires, and bags of garbage.

(7)     There was an accumulation of old tires in a small creek near the mobile home.

(8)     Mr. Vladyka promised to bring a dump truck to the property to clean up the junk but never did.

(9)     Ms. Marsh and her friends cleaned up some of the junk to the point where she could mow the grass.

(10)    Every month it was Mr. Vladyka's custom to come to the home to pick up the rent payment.

(11)    During the winter, there were heating problems with the mobile home. For instance Ms. Marsh's bedroom did not receive heat.

(12)    The average heating bill during the winter was $600.

(13)    Mr. Vladyka attempted to repair the heating in the bedroom by patching the room with aluminum foil.

(14)    Ms. Marsh was forced to sleep in her living room for lack of heat in the bedroom.

(15)    In December 2007, Mr. Vladyka asked Ms. Marsh if she wanted ownership of the mobile home.

(16)    Ms. Marsh told Mr. Vladyka that she would think about it.

(17)    In February 2008, Mr. Vladyka again asked Ms. Marsh if she would like ownership.

(18)    Ms. Marsh responded that she did not want her name on the mobile home and that she would not sign anything.

(19)    At some point prior to January 2009, Mr. Vladyka filed a Bill of Sale in the town UCC Records, purporting to transfer ownership of the mobile home to Ms. Marsh.

(20)    Ms. Marsh gave no consideration for the mobile home and she did not sign the bill of sale.

(21) On February 7, 2009, Ms. Marsh called Mr. Vladyka regarding a sewage back-up problem at the home.

(22) Sewage was backing up into the bathtub when the toilet flushed.

(23) Mr. Vladyka came to the home on February 8 to fix the sewage problem.

(24) Mr. Vladyka's "fix" was to disconnect the sewage pipe under the mobile home, allowing the sewage to spew onto the ground under and surrounding the home.

(25) Neither Ms. Marsh nor any member of the household ever disconnected the pipe or went under the home.

(26) On February 22nd, a state official came out to the home to look at the sewage problem. He took pictures and spoke with Mr. Vladyka.

(27) That same day, Mr. Vladyka reconnected the sewage pipe. The sewage backed up into the tub again.

(28) The next day, February 23rd, Ms. Marsh received a notice of eviction from Mr. Vladyka.

(29) The notice of eviction cited accumulation of trash and unpaid rent as the reasons for eviction.

(30) Later that February, the sewage pipes froze for lack of insulation, which was torn and strewn about under the home.

(31) Monthly rent of $495 has been paid into Court by Ms. Marsh for the months of February 2009 and onward.

## CONCLUSIONS OF LAW

The warranty of habitability is set forth in 9 V.S.A. § 4457(a), which states that "[i]n any residential rental agreement, the landlord shall be deemed to covenant and warrant to deliver over and maintain, throughout the period of the tenancy, premises that are safe, clean and fit for human habitation and which comply with the requirements of applicable building, housing, and health regulations." Furthermore, as part of the warranty of habitability, "the landlord shall ensure that the dwelling unit has heating facilities which are capable of safely providing a reasonable amount of heat." § 4457(c).

If the landlord fails to comply with the obligations for habitability and, after receiving actual notice, fails to make repairs within a reasonable time and the noncompliance materially affects health and safety, the tenant may: (1) withhold payment of rent during the period of noncompliance; (2) obtain injunctive relief; (3) recover damages, costs and reasonable attorney's fees; and (4) terminate the rental agreement on reasonable notice. 9 V.S.A. § 4458(a). Here, the tenants seeks to withhold payment and to recover attorney's fees. These remedies, however, are available only if the noncompliance was not caused by the tenant's negligence or deliberate act or omission. § 4458(b).

Here, the premises were uninhabitable in three aspects. First, the failure to fix the sewage backup materially affected the health and safety of the tenants. Instead of actually fixing the sewage backup, Mr. Vladyka disconnected the sewage pipe, allowing raw sewage to spew out under the mobile home. This was wrong on many levels. When the state official spoke with Mr. Vladyka later that month, Mr. Vladyka finally reconnected the pipe. However, this did not fix the problem and sewage continued to backup into the bathtub. Furthermore, the insulation surrounding the sewage pipes was torn off and strewn about under the mobile home. This caused the sewage pipes to freeze.

Second, the property has so much garbage on it that it appears as if the mobile home is placed in the middle of a junk yard. This junk was there when the tenants moved in. It includes an old non-covered boat that is filled with trash, an old refrigerator that still has meat and various foods in it, an old rusted water heater, old mattresses, broken glass strewn about near the mobile home and boat, and many bags of garbage. In the stream near the mobile home are numerous old tires.

Third, when the tenants notified Mr. Vladyka about the lack of heat in the bedroom, he proposed to fix the problem by using aluminum foil to patch the room. This did not solve the problem. The tenants paid $600 a month for heat and Ms. Marsh was forced to sleep in the living room during the winter. The warranty of habitability requires that the dwelling unit have heating facilities which are capable of safely providing a reasonable amount of heat. 9 V.S.A. § 4457(c).

Each of these aspects, independently, make the premises uninhabitable. Combined, the overall condition of the premises is deplorable and not fit for human habitation. The lack of proper sewage, heat, and safe surroundings are a serious threat to the health and safety of the tenants and their children. The defendant-tenants were entitled to withhold rent. Thus, they will be refunded the rent the they have paid into Court. Furthermore, they are entitled to attorney's fees.

Turning to the tenants' claim for retaliatory eviction, a landlord of a residential dwelling unit may not retaliate by bringing an action against a tenant who has complained to a government agency regarding a violation of a health regulation which affects health and safety, or has complained to the landlord of a violation. 9 V.S.A. § 4465(a). If the landlord does retaliate, the tenant is entitled to recover damages and reasonable attorney's fees and has a defense in any retaliatory action for possession. § 4465(b).

Here, the tenants have proved their claim. They notified Mr. Vladyka numerous times as to each of the problems at the mobile home. One day after the state official came to the premises and made Mr. Vladyka reconnect the sewage pipe, Mr. Vladyka notified the tenants that they were being evicted. He then brought this suit for back rent and a write of possession, based on non-payment of rent and accumulated garbage on the

property. The tenants have proven that they were entitled to withhold rent and the garbage was not theirs. The eviction action by Mr. Vladyka was an act of retaliation.

The tenants seek punitive damages for the retaliatory eviction action. "To demonstrate the malice necessary to establish liability for punitive damages, one must show conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 24, 185 Vt. 267. "[I]n addition to a showing of illegal, wrongful, or reckless conduct, there must be some evidence of bad motive on the defendant's part to establish malice and support an award of punitive damages." *Id*. "[M]alice may arise from deliberate and outrageous conduct aimed at securing financial gain or some other advantage at another's expense, even if the motivation underlying the outrageous conduct is to benefit oneself rather than harm another." *Id*. at ¶ 27.

Here, in addition to the evidence of retaliatory eviction following the complaints to Mr. Vladyka and the visit from the state official, Mr. Vladyka also attempted to place ownership of the mobile home in Ms. Marsh's name. Ms. Marsh expressly told Mr. Vladyka that she did not want to own the mobile home and that she would not sign anything. Still, Mr. Vladyka filed a bill of sale in the UCC records, without Ms. Marsh's signature and without any consideration paid by her, in an attempt to shift responsibility for maintenance of the premises away from him. Mr. Vladyka's goal was to place ownership of the mobile home in Ms. Marsh's name so that he would not have make the proper repairs and provide her with a habitability premises, as was his responsibility as her landlord. This was "deliberate and outrageous conduct" aimed at securing financial gain for Mr. Vladyka at Ms. Marsh's expense. See *DeYoung*, 2009 VT 9, ¶ 27 (holding

malice exists even if the motivation underlying the outrageous conduct is to benefit oneself rather than harm another).

Punitive damages by their nature cannot be precisely measured, and their assessment is largely within the fact-finder's discretion. *Pion v. Bean*, 2003 VT 79, ¶ 44, 176 Vt. 1. "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Shahi v. Madden*, 2008 VT 25, ¶ 26, 183 Vt. 320 (quoting *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 419 (2003)).

Reprehensibility is to be determined by reference to whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Shahi*, 2008 VT 25, ¶ 26 (citing *Campbell*, 538 U.S. at 419).

Here, the tortious conduct evinced a reckless disregard for the health and safety of others as Mr. Vladyka attempted to rid himself of his landlord duties while allowing his tenants to live in an uninhabitable premises. This included directing raw sewage to accumulate under the house instead of properly fixing the problem. Next, the tenants who were the target of the conduct had financial vulnerability as they did not make a lot of money. The conduct involved the filing of a retaliatory eviction action designed to relieve Mr. Vladyka of his duties as landlord, at which he failed repeatedly, to provide habitable premises for his tenants. Finally, the harm was the result of an intentional act. Mr.

Vladyka intentionally sought to evict the tenants, after intentionally filing a false bill of sale and intentionally refusing the clean up and fix the premises.

As such, the defendants are entitled to punitive damages. The Court finds that two times the amount of rent currently held by the Court is the appropriate amount. The Court also finds that defendants are entitled to reasonable attorney's fees.

**ORDER**

(1) Judgment to the defendants in the amount of all accumulated rents paid into the Court from February 2009 to present. This judgment reflects defendants legal right to withhold rent for breach for the warranty of habitability. The rents paid in to Court shall be released to Defendant's after 10 days, unless there is good cause shown by Plaintiff.

(2) Punitive damages of $6,930.00; the amount equal to two times the amount of the rent which was paid into Court from the months of February to August 2009.

(3) The defendants are awarded costs and expenses, including reasonable attorney's fees. The defendants' counsel will submit the information as to attorney's fees.

Dated at Rutland, Vermont this _____ day of _____, 2010.

_____
Hon. William Cohen
Superior Court Judge

8