2010 VT 66

## J.A. Morrissey, Inc. v. Peter Smejkal, Iva Smejkal, Merkur Construction, LLC and IS Enterprises, LLC

[6 A.3d 701]

No. 09-215

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed July 2, 2010

*Michael J. Gannon* of *Affolter Gannon & Rose, Ltd.*, Essex Junction, for Plaintiff-Appellee.

*Robert S. DiPalma* and *Sonya L. Sibold* of *Paul Frank + Collins P.C.*, Burlington, for Defendants-Appellants.

¶ 1. **Johnson, J.** This case arises from the demise of a business relationship within a construction company. Defendants Peter

Smejkal, Iva Smejkal, Merkur Construction, LLC, and IS Enterprises, LLC appeal from the partial denial of their post-trial motion for judgment as a matter of law, or in the alternative, for a new trial, following a jury verdict in favor of plaintiffs Jeanne Morrissey and J.A. Morrissey, Inc. in an action for breach of fiduciary duty, interference with business relations, and fraudulent conveyance. We affirm.

¶ 2. Peter Smejkal began his employment as an estimator and project manager at J.A. Morrissey, Inc. (JAM) shortly after it was established by Jeanne Morrissey in the summer of 1993. By 1997, Smejkal held the position of vice-president and corporate director of JAM. Morrissey remained the sole shareholder and president of the company and retained control over personnel and financial decisions. The relationship between the parties began to deteriorate when Morrissey discovered that Smejkal had engaged in self-dealing, contrary to company policy. Following the deterioration of their employment relationship, Smejkal was terminated from JAM in September 2003. Also in that month, Smejkal began operating his own construction company, Merkur Construction, LLC (Merkur), which was officially incorporated in January 2004.[1]

¶ 3. The current dispute involves the actions of Smejkal, individually and as the owner of several contracting companies, both before and after he was terminated from JAM, with regard to several projects commissioned by clients originally belonging to JAM: (1) the Paluska project; (2) the Johnson project; and (3) the Benware project. These projects involved clients who had initially contracted with JAM for services and with whom Smejkal worked as an employee of JAM prior to his termination. Following Smejkal's termination, each of these projects was completed wholly or partially by Smejkal's newly-formed contracting company. JAM also took issue with Smejkal's actions concerning property at 174 Avenue C in Williston, Vermont (Avenue C), a commercial property that Smejkal personally purchased and renovated during his employment at JAM. JAM moved its offices into Avenue C upon Smejkal's suggestion and argues that Smejkal's conduct with regard to the move and lease — including unauthorized use of JAM personnel and equipment and unauthorized

---

[1] On the day that Smejkal registered Merkur, Smejkal also unregistered Merkur Construction & Design, a company that he had maintained during his employment with JAM.

fit-up expenses charged to JAM — caused JAM to lose a substantial amount of money.

¶ 4. JAM filed suit in May 2004, with Smejkal alone listed as the defendant. JAM later amended its original complaint, adding Iva Smejkal (Iva), Merkur, and IS Enterprises, LLC, as defendants. The amended complaint included the following: (1) a claim for breach of fiduciary duty against Smejkal; (2) an interference with prospective business relationships claim against Smejkal, Iva, and Merkur[2]; and (3) a fraudulent conveyance claim against Smejkal and Iva. Additionally, Smejkal and Iva counterclaimed against JAM for damages that resulted from JAM's departure from Avenue C.[3] A five-day jury trial was held in Chittenden Superior Court in November 2008.

¶ 5. The jury found Smejkal liable for breach of fiduciary duty with respect to the Paluska, Johnson, and Avenue C projects. The jury concluded that Smejkal was liable for interference with prospective business relationships only with respect to the Johnson project, but that Merkur was liable with respect to both the Paluska and Johnson projects. The jury also found that Smejkal and Merkur fraudulently transferred assets to Iva and/or IS Enterprises. The court awarded JAM a total amount of $293,043.32, including compensatory damages, punitive damages, and costs. Of that amount, $25,000 represented punitive damages against Smejkal. Punitive damages against Iva Smejkal were assessed at $75,000. Additionally, the jury determined that the Smejkals were entitled to damages on their counterclaim against JAM, and judgment was entered in the amount of $12,166.53.

¶ 6. Following the verdict, defendants moved for judgment as a matter of law or, in the alternative, for a new trial. In its decision and entry order, the trial court partially granted defendants' motion by striking the award of punitive damages against Iva, finding that because Iva was not found liable for any claim, there was no basis to sustain punitive damages against her. The court upheld the rest of the jury's verdict, denied the motion for a new

---

[2] The interference claim ran against Iva only with respect to the Benware project.

[3] Plaintiffs also argue in their brief that the trial court erred in vacating the punitive damage award against Iva. Plaintiffs did not timely file a cross-appeal, and thus we will not address this argument. See *Huddleston v. Univ. of Vt.*, 168 Vt. 249, 256, 719 A.2d 415, 419-20 (1998) (noting that this Court lacks jurisdiction to reach merits of claim of appellee who did not cross-appeal).

trial, and entered an amended final judgment. This appeal followed.

¶ 7. On appeal, defendants challenge the trial court's denial of their motion for judgment as a matter of law or, in the alternative, for a new trial. First, they assert that the evidence did not support the jury's conclusion that Smejkal breached his fiduciary duties with respect to the Paluska, Johnson, and Avenue C projects. Second, defendants challenge the jury's verdict with respect to interference with prospective business relationships, contending that the evidence did not support a finding of liability against Merkur or Smejkal. Third, defendants argue that the fraudulent conveyance finding was erroneous as to the conveyance of the Avenue C building to IS Enterprises. Finally, defendants assert that punitive damages were not properly assessed against Smejkal because there was insufficient evidence of malice.

¶ 8. We review a denial of a motion for judgment as a matter of law de novo pursuant to Vermont Rule of Civil Procedure 50 "in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence." *Follo v. Florindo*, 2009 VT 11, ¶ 26, 185 Vt. 390, 970 A.2d 1230. Judgment as a matter of law is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue." V.R.C.P. 50(a)(1). Thus, we will reverse the trial court's denial of a motion for judgment as a matter of law only where no evidence exists that fairly and reasonably supports the jury's verdict. *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122, 730 A.2d 1086, 1090 (1999).

¶ 9. In reviewing the denial of a motion for a new trial under Vermont Rule of Civil Procedure 59(a), we note that "[t]he law favors upholding jury verdicts" and that the decision to grant or deny a motion for a new trial is committed to "the sound discretion of the trial court." *Shahi v. Madden*, 2008 VT 25, ¶ 14, 183 Vt. 320, 949 A.2d 1022. We will reverse the trial court's decision only where, viewing the evidence in the light most favorable to the verdict, we conclude that there has been an abuse of discretion. *Id.*

¶ 10. With this deferential standard of review in mind, we turn to defendants' first argument. Defendants contend that the jury verdict finding that Smejkal breached his fiduciary duties with respect to the Paluska, Johnson, and Avenue C projects was

against the weight of the evidence. To establish a claim for breach of fiduciary duty, JAM had to show that: (1) Smejkal owed JAM a fiduciary duty; and (2) that duty required Smejkal to act in good faith and with loyalty for the advancement of JAM's interests. In Vermont, a corporate director must discharge his or her duties: "(1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the director reasonably believes to be in the best interests of the corporation." 11A V.S.A. § 8.30(a)(1)-(3). As part of the fiduciary duty owed to the corporation, a director may not profit at the expense or against the interest of the corporation. *Lash v. Lash Furniture Co. of Barre*, 130 Vt. 517, 522, 296 A.2d 207, 211 (1972). The duties of good faith and loyalty require that a director must not allow personal interests to interfere with or supersede the interests of the corporation.

¶ 11. It is undisputed that Smejkal owed a fiduciary duty to JAM in his role as vice-president and corporate director of the company. This duty imposed an obligation upon Smejkal to act with the utmost good faith and loyalty for the best interests of JAM. See *Vt. Dep't of Pub. Serv. v. Mass. Mun. Wholesale Elec. Co.*, 151 Vt. 73, 89, 558 A.2d 215, 224 (1988) ("Directors of a corporation are regarded as fiduciaries and are required to exercise their own independent judgment for the highest welfare of the corporation . . . ." (quotation omitted)); *Lash*, 130 Vt. at 522, 296 A.2d at 211 ("The relationship of a director . . . to his corporation binds him to use the utmost good faith and loyalty for the furtherance and advancement of the interest of that corporation.").

¶ 12. First, with regard to the Paluska project, there is sufficient evidence that Smejkal breached his fiduciary duties to JAM. Unknown to Morrissey, Smejkal purchased an excavator and utilized his own newly-formed excavation company, Landworks Adventures, LLC, to complete excavation work at the Paluska site. Creating an excavation company for purposes of in-house excavation work was contrary to JAM policy, and Morrissey had expressly rejected Smejkal's previous attempts to convince her to allow in-house excavation work. Further, during Smejkal's work on the Paluska project, it became clear that the quality of the excavation work was sub-par. Testimony at trial indicated that in response to the client's concern Smejkal attributed the poor-quality work performed by his excavation company to JAM —

including the failure to obtain proper insurance, VOSHA violations, increased costs and delays, and failure to adhere to engineering specifications. Additionally, there was evidence to suggest that Smejkal conducted secret conversations with Paluska, the site owner, about whether the project could be completed without JAM.

¶ 13. This evidence — including Smejkal's attempts to undermine the business relationship between JAM and Paluska; his attribution of problems with the excavation work to JAM; and the secret use of his own company to perform work — indicates that Smejkal engaged in a concerted plan of action to siphon the Paluska project from JAM for his own company. Notwithstanding Smejkal's argument that Paluska "willingly" terminated his relationship with JAM in favor of hiring Smejkal's company, the fact that Smejkal managed to convince Paluska to fire JAM does not mean that Smejkal is without liability. Indeed, the evidence here was sufficient for the jury to conclude that Smejkal orchestrated the entire sequence of events.

¶ 14. There is also adequate evidence in the record that Smejkal breached his fiduciary duties with respect to the Johnson project. Prior to his termination from JAM, Smejkal was approached regarding an estimate from JAM for a residential project for a client named Johnson. Smejkal failed to inform Morrissey about the initial estimate or the existence of the Johnson project and instead utilized Landworks to perform a portion of the project while still employed by JAM without disclosing his involvement to Morrissey. Smejkal conducted several project development meetings at the site while still employed by JAM. At one such meeting, Smejkal solicited others to form an excavation company with himself and his wife and explicitly acknowledged that he was going ahead with forming the company despite Morrissey's disapproval of such a plan.

¶ 15. Based on these facts, the jury could have concluded that Smejkal abused his position and intentionally failed to inform JAM about the Johnson estimate because he wanted to usurp the project for himself, thereby breaching his fiduciary duties to JAM. See *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) ("Officers and directors have been found to have breached their fiduciary duties when, while still employed by the company, they . . . solicit the business of a single customer before leaving

the company, [or] use the company's facilities or equipment to assist them in developing their new business . . . ."); *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 993 (Ill. App. Ct. 1993) ("A corporation's fiduciary is not permitted to . . . take advantage of business opportunities which are considered to belong to the corporation as far as the fiduciary is concerned.").

¶ 16. Finally, there was ample evidence to support the jury's finding that Smejkal breached his fiduciary duties with respect to the Avenue C project. In November 2002, Smejkal informed Morrissey that he planned to purchase a commercial property and proposed that JAM's offices be moved into the space. Morrissey agreed to lease a portion of the building for JAM's offices on a yearly basis. Smejkal's continued employment at JAM was a critical factor in the loan approval process Smejkal needed to purchase the property.

¶ 17. Evidence was also introduced indicating that after purchasing Avenue C Smejkal used JAM employees for construction activities that were unrelated to JAM's tenancy. Smejkal also asked a local contractor to bill JAM for the installation of heating and air conditioning in the entire building, rather than billing JAM only for services associated with their tenancy. This resulted in fit-up costs — which Morrissey had agreed to pay to ready the space for JAM's arrival — that were much more expensive than originally agreed on by the parties. Smejkal also convinced the contractor to perform services "at cost" — a much reduced price — in exchange for a promise that he would provide work for the contractor from JAM directly so that the contractor would not have to compete for jobs through JAM's normal bidding procedure for subcontracting work. Such a promise was contrary to JAM policy and was not approved by Morrissey. Similarly, Smejkal billed a JAM project account that was completely unassociated with Avenue C for construction costs at Avenue C that were unrelated to JAM's fit-up. When another employee spotted the irregularity and mentioned it to Smejkal, Smejkal requested that he submit the erroneous bill "as a favor."

¶ 18. This evidence supports the theory that Smejkal used his position at JAM to secure financing to purchase Avenue C for his own benefit, encouraged JAM to move into the property, and then orchestrated JAM's incursion of higher fit-up costs than initially promised and billed JAM for construction unrelated to its tenancy. Based on these facts, a reasonable jury could have concluded that

Smejkal breached his fiduciary duties with respect to the Avenue C project.

¶ 19. For each of these projects, Smejkal's actions did not demonstrate the good faith that must lie at the heart of any fiduciary relationship. Instead, the evidence shows that Smejkal had a calculated plan to use the trust that Morrissey and JAM placed in him to sabotage JAM and to personally benefit from his position at JAM. Therefore, the trial court did not err in denying defendants' motion for judgment as a matter of law or a new trial.

¶ 20. Defendants next argue that the jury erred as a matter of law when it found Smejkal and Merkur liable for interfering with prospective business relationships. We disagree.

¶ 21. To prevail on a claim for interference with prospective business relationships, a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference on the part of the interferer; (4) damage to the party whose relationship or expectancy was disrupted; and (5) proof that the interference caused the harm sustained. *Gifford v. Sun Data, Inc.*, 165 Vt. 611, 613 n.2, 686 A.2d 472, 474 n.2 (1996). A plaintiff must show that the interferer acted with the purpose to harm the plaintiff or by means that are dishonest, unfair, or improper. *Id.* at 613, 686 A.2d at 474-75. Competitive business practices are not proscribed under the tort unless those practices are criminal or fraudulent. *Id.* at 613, 686 A.2d at 475; see Restatement (Second) of Torts § 768(1)(b) (1979) (competition does not rise to level of improper interference if "actor does not employ wrongful means").

¶ 22. The policy underlying the tort of interference with prospective business relationships is to protect an interest in stable economic relationships, and it extends to business relationships that may not be formally reduced to contract. *Gifford*, 165 Vt. at 613, 686 A.2d at 474. Thus, the tort applies to situations where the economic relationship or expectancy is only *prospective*, though there must exist a reasonable probability that a business or contractual relationship would have arisen but for the conduct of the defendant; a mere hope or wish for such a relationship to arise is insufficient. See, e.g., *id.* at 615, 686 A.2d at 475 (concluding that prospective relationship "too speculative" where seller had previously tried, but failed, to sell to buyer); *Mitchell v.*

*Aldrich*, 122 Vt. 19, 23, 163 A.2d 833, 836 (1960) ("Protection is appropriate against unjustified interference with *reasonable expectancies* of profit . . . ." (emphasis added)); *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 542 (D. Md. 2006) (noting that each state court "which has addressed the issue has found that the party *must* establish some evidence that a prospective business relationship is likely to occur").

¶ 23. Defendants first assert that the jury's finding of liability against Merkur with regard to the Paluska project is erroneous and unsupported by the record. The evidence presented at trial showed that Smejkal was aware of JAM's business expectancy to work with Paluska because Paluska signed a letter of intent indicating that he intended to complete his construction project with JAM and Smejkal completed many preconstruction activities at the site in his capacity as a JAM employee. A JAM employee testified that when Smejkal spoke with him about problems associated with work done by Landworks, Smejkal's excavation company, at the Paluska site, Smejkal used an expletive in reference to Morrissey and stated that he did not need her, would be "just fine" working on his own, and planned to "do Paluska's job with or without J.A. Morrissey." Smejkal then proceeded to solicit JAM employees to begin a new company with him while he was still employed by JAM. Further, Smejkal discussed taking over the job with Paluska from JAM at some point prior to the September 2003 meeting with Morrissey — as evidenced by the fact that, according to Morrissey's testimony, at the meeting in which Paluska dissolved his relationship with JAM, he turned to Smejkal and asked whether he was "as confident that you can run this thing as you were when you and I spoke about it."

¶ 24. Based on these facts, it was reasonable for the jury to infer that Smejkal wrongfully used his position as a trusted, high-ranking JAM employee to sabotage JAM and then usurp Paluska as a client for his new company. The jury could have found on this record that Smejkal intentionally fostered a relationship with Paluska and then blamed excavation problems on JAM so that Paluska would eventually choose to replace JAM with Smejkal. Given these facts, we agree with the trial court that a jury "could have found on this record that, despite the patina of seemingly aboveboard conduct, that underneath it all Smejkal was scheming to, and did foment critical dissatisfaction between JAM and its client" in an effort to steer Paluska away from JAM and

towards himself. Compare *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 283 (6th Cir. 1991) (concluding that jury could find improper interference with prospective economic advantage where defendant obtained a bread deliverer's customer list by deceit and then took over the delivery route) with *Gifford*, 165 Vt. at 614, 686 A.2d at 476 (finding no improper interference with prospective business relationship where plaintiff did not make predictable sales to reliable customers and there was no evidence that the defendant used deceit to undermine the plaintiff's business). Smejkal's breach of fiduciary duties during the course of the Paluska project further evidences his use of improper means to interfere with JAM's business expectancy. See *Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345, 361 (E.D.N.Y. 2008) (stating that example of "improper means" in context of interference with business relationship is breach of fiduciary relationship).

¶ 25. Defendants, nonetheless, argue that Merkur cannot be liable because Merkur was formed the weekend after the meeting in which Paluska dissolved his relationship with JAM and thus there was no "operative prospective relationship" with which to interfere. We find this argument unavailing. It was not error to find Merkur solely liable for tortious interference with the Paluska project because the jury could have found on this record that Smejkal had been planning all along to usurp the Paluska project and was acting for the benefit of his future company, Merkur, rather than for his own individual benefit. Thus, the jury could have concluded that Smejkal was acting on behalf of Merkur prior to its formation date and during the period in which JAM still possessed a prospective business relationship with Paluska. Further, as noted by the trial court, the jury may have concluded that Paluska's "choice" to replace JAM with Smejkal "was engineered and facilitated by wrongful interference" by Smejkal. Thus, Smejkal's interference with JAM and Paluska's relationship, undertaken on behalf of his planned company, caused the operative business relationship between JAM and Paluska to cease by the time Merkur was officially incorporated.[4]

---

[4] Defendants argue there is a fatal "inconsistency in the verdict that cannot be reconciled." They assert that because the jury found that Smejkal was not liable for interference with regard to the Paluska project, Merkur could not be found similarly liable with regard to this project because "the actions of Mr. Smejkal were, as a matter of law, the actions of Merkur." The jury instructions included the following with respect to liability of Smejkal and Merkur:

¶ 26. Defendants next contend that the jury's finding that both Smejkal and Merkur were liable for interference with respect to the Johnson project is similarly unsupported by the record. The evidence at trial showed that JAM was contacted via Smejkal, who then performed an estimate for the Johnson project. Though he was approached for the estimate in his capacity as a JAM employee, correspondence for the estimate was provided by Smejkal on his Landworks letterhead, with Smejkal listed as the general contractor and providing his home address, but also providing a JAM office phone number. Some months later, Smejkal was contacted about performing site work for the Johnson project. Smejkal determined that JAM would not be interested in this portion of the project and instead completed it on his own. Following his termination from JAM, Smejkal completed additional work at the Johnson site as Merkur. Smejkal never informed Morrissey that he had been approached about the estimate, nor did he disclose his meetings with, or work completed for, Johnson.

¶ 27. Based on these facts, it was reasonable for the jury to conclude that Smejkal — both individually and as a representative of Merkur — interfered with a prospective business relationship in which JAM had a reasonable expectancy. The jury could have inferred that Smejkal knew that the Johnson estimate would generate work for JAM and then chose not to tell anyone at JAM about the estimate or his work on the project because he wanted to perform work for Johnson himself and for his own benefit. Indeed, the facts show that Smejkal abused his position of trust at JAM to surreptitiously obtain work for himself. See

---

I charge you as a matter of law that Peter Smejkal was, at certain times relevant to this case, that is, after the legal formation of Merkur Construction, LLC in September 2003, acting within the scope of and performing duties as the principal member of Merkur Construction, LLC, and therefore, all of his actions, or lack of action, should be considered by you as if they were the acts or conduct of Merkur Construction itself for that period of time following Peter Smejkal's termination from J.A. Morrissey's employment in September 2003.

We do not find, given the court's instruction that Merkur and Smejkal were one in the same, that the jury's verdict against only one party on the Paluska project evidences an inconsistency that warrants reversal. The issue is whether the verdict against Merkur is supported by adequate evidence, and on this question there is no doubt.

*Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 215 S.W.3d 596, 607 (Ark. 2005) (noting that "the relations between the parties" is one factor to consider when determining whether a defendant's conduct is "improper"); *Augat, Inc. v. Aegis, Inc.*, 565 N.E.2d 415, 420 (Mass. 1991) ("[An employee] may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer."); Restatement (Second) of Torts § 767 (listing relationship between parties as factor to consider in determining whether actor's conduct in intentionally interfering with prospective contractual relation of another is improper). The jury was free to discredit Smejkal's claim that he performed the smaller job for Johnson with the intention of securing a later, larger project for JAM.

¶ 28. Defendants next assert that the jury's finding that Smejkal and Merkur fraudulently conveyed assets — from accounts held by Smejkal, Merkur, or jointly by Smejkal and Iva, to accounts held jointly or solely by Iva or IS Enterprises for the purpose of shielding the assets from a judgment in this suit — was erroneous. In particular, defendants assert that the conveyance of Avenue C from Smejkal to IS Enterprises does not fall under the fraudulent conveyance statute because it is not an "asset" as a result of being held at some point in a tenancy by the entirety.

¶ 29. The evidence showed that Smejkal and Merkur fraudulently conveyed assets to Iva and IS Enterprises. Following the initiation of this lawsuit, an odd series of transactions occurred that shuffled funds between the couple's various bank accounts, of which there are at least ten. One joint account was closed, and the entire balance of $302,000 was transferred into an account held by Iva alone. Three large checks were written from the Merkur company account to pay the Smejkals' home equity loans, and others were written to Iva personally. Other funds were placed in investment accounts or used for the purchase of three vehicles. Additionally, the Avenue C property was transferred from Smejkal's name to IS Enterprises. Evidence was presented indicating that Iva destroyed certain tax information from the time period in question that related to Merkur's profits. When asked why one tax document that had been found listed her as a co-proprietor of Merkur, she stated that it was a clerical error. There was also witness testimony that Smejkal told others that he was "too smart . . . and [Jeanne] would never see any of his money" because he had transferred it into his wife's name.

¶ 30. Our fraudulent conveyance statute, 9 V.S.A. § 2288(a)(1), provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor of the debtor." A transfer that was made after a debtor was sued or threatened with suit is indicative of fraud. *Id.* § 2288(b)(4).

¶ 31. The evidence here was sufficient for the jury to conclude that Smejkal and Merkur, as potential debtors to JAM, fraudulently transferred assets to Iva and IS Enterprises "with actual intent to hinder, delay or defraud." *Id.* § 2288(a)(1). Indeed, the record is replete with facts that indicate that the Smejkals purposely funneled to Iva or her company in an effort to shield those funds from a judgment in JAM's favor.

¶ 32. Defendants challenge the fraudulent conveyance finding on the basis of their claimed former holding of the Avenue C property as a tenancy by the entirety. This argument is without merit. Though defendants may have at one point held the property as a tenancy by the entirety,[5] that fact does not insulate them from liability. There is ample evidence here to support the inference that the Smejkals intentionally transferred Avenue C to IS Enterprises after the initiation of the lawsuit in an attempt to shield it from judgment. Though it is true that "asset" is defined to exclude "an interest in property held in tenancy by the entireties," that exclusion applies only "to the extent [the property] is not subject to process by a creditor holding a claim against only one tenant." *Id.* § 2285(2)(C). Here, the claim was against both Iva and Smejkal, rather than against only one tenant. The record provides support for the finding that Smejkal and Iva, in cooperation, purposefully conveyed the property to IS Enterprises to shield the property from a judgment in this case. Any conveyance of property made with the intent to defraud creditors is voidable as to the creditors even though it may be otherwise valid. See *id.* § 2288(b)(1) (looking to whether transfer was to an "insider," which is defined by § 2285(6)(A)(i) to include relative of

---

[5] It is not clear when or for how long the Avenue C property was held as a tenancy by the entirety. Defendants allege that it was purchased as a tenancy by the entirety and was held as such until the conveyance to IS Enterprises. Other evidence, however, suggests that the property was initially purchased in Smejkal's name alone.

the debtor, to determine whether intent to defraud existed); *In re Montagne*, 417 B.R. 232, 239 (Bankr. D. Vt. 2009) ("The rule is that every conveyance made with the actual intent to defraud creditors is fraudulent as to creditors and will be set aside." (quotation omitted)).

¶ 33. We turn finally to the punitive damages award. Defendants assert that punitive damages were not properly assessed against Smejkal because there was insufficient evidence of malice. We agree with the trial court that there was sufficient evidence presented to support the jury's finding of malice.

¶ 34. An award of punitive damages requires a showing of: (1) wrongful conduct that is outrageously reprehensible; and (2) malice. *Fly Fish Vt., Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 18, 187 Vt. 541, 996 A.2d 1167. Malice is "defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Id.* Malice may be found where one seeks to profit, through conduct that is deliberate and outrageous, at the expense of another even where the conduct is intended to benefit oneself. *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 27, 185 Vt. 267, 971 A.2d 627 ("[M]alice may arise from deliberate and outrageous conduct aimed at securing financial gain or some other advantage at another's expense, even if the motivation underlying the outrageous conduct is to benefit oneself rather than harm another.").

¶ 35. Accordingly, we conclude that the evidence presented here is sufficient to support the jury's assessment of punitive damages against Smejkal because, as the trial court noted, the record is such that the jury could have found that Smejkal "harbored ill will, and actual malice towards JAM, and intentionally desired, and took concrete actions to steer economic benefits to himself and away from JAM." In light of the relationship between the parties and the trust that was placed in Smejkal as an important member of a small company, his actions meet the standard of intentional and sufficiently wrongful conduct necessary to sustain punitive damages. See *id.*

¶ 36. The jury could have properly found on this record that Smejkal's conduct — which included a concerted effort to sabotage JAM's professional relationship with longstanding clients and to siphon off those clients for his own financial benefit — demonstrated actual malice towards JAM. Compare *Villeneuve v. Beane*, 2007 VT 75, ¶ 10, 182 Vt. 575, 933 A.2d 1139 (mem.)

(concluding that landlord's conduct in unlawfully evicting tenants was "intentional, unlawful, criminal in nature, and outrageous" and justified punitive damages) with *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶¶ 53, 60, 179 Vt. 167, 893 A.2d 298 (concluding that "conduct that does not involve a deliberate decision by the promisor to breach, falls far short of the punitive damages standard" and that conduct evidencing breach of covenant of good faith and fair dealing which consisted "mainly of inaction" did not "indicate the personal ill will, or evidence the bad motive associated with malice"). Further, we agree with the trial court's conclusion that the relatively small measure of punitive damages awarded, $25,000, compared with the total compensatory damages of $255,876.39 refutes the possibility that the jury was overcome with passion or prejudice.

*Affirmed.*