NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 34

No. 2014-260

| | |
|---|---|
| Fred Osier and Eugene H. Shaver | Supreme Court |
| | |
| v. | On Appeal from Superior Court, Chittenden Unit, Civil Division |
| | |
| Burlington Telecom, City of Burlington and Jonathan Leopold | March Term, 2015 |

Helen M. Toor, J.

Norman Williams, Robert B. Hemley and David A. Boyd of Gravel & Shea PC, Burlington, for Plaintiffs-Appellants/Cross-Appellees.

Marc B. Heath and Jennifer E. McDonald of Downs Rachlin Martin PLLC, Burlington, for Defendant-Appellee City of Burlington.

Robin Ober Cooley, Ryan B. Gardner and Richard H. Wadhams, Jr. of Pierson Wadhams Quinn Yates & Coffrin, LLP, Burlington, for Defendant-Appellee/Cross-Appellant Leopold.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **REIBER, C.J.** Plaintiff-taxpayers Fred Osier and Eugene H. Shaver sued defendants to recover and restore to the City of Burlington's general fund $16.9 million in cost overruns incurred by the City in connection with the operation of Burlington Telecom (BT). BT is a City-owned enterprise that provides an optical fiber-to-the-home network to Burlington residents and businesses. The trial court granted judgment to defendants City of Burlington and the City's former Chief Administrative Officer (CAO) Jonathan Leopold. Taxpayers appeal, challenging the court's denial of their request for an accounting from the City and its denial of

their request to hold Leopold personally liable for the $16.9 million in City funds used for BT. Leopold cross-appeals, offering additional reasons why he should not be held liable.

¶ 2.     As set forth below, we conclude that the trial court acted within its discretion in denying taxpayers' request for an accounting. We also agree that Leopold is not personally liable for the $16.9 million in cost overruns. In reaching this conclusion, we adopt the standard identified by the court in its pretrial ruling and hold that any claim against Leopold must include an element of bad faith. That critical element is lacking here. We thus affirm the trial court's decision as to Leopold's liability on this basis.

## I. Background

¶ 3.     We begin with an overview of the BT controversy, relying on undisputed facts identified by the trial court in response to a pretrial motion. The Burlington City Charter allows the City to own, operate, and use "cable television, fiber optic cable and other telecommunications within the corporate limits of the city." 1995, No. M-17 (Adj. Sess.), § 23 (codified as amended at 24 V.S.A. App. Ch. 3 § 431(4) (City of Burlington)). The charter requires that any City-owned utility obtain a certificate of public good from the Public Service Board (PSB).

¶ 4.     The charter also addresses funding for such projects, stating that:

> If the city [elects to build a cable system], the Public Service Board, in considering any application for a certificate of public good, shall ensure that any and all losses from these businesses, and, in the event these businesses are abandoned or curtailed, any and all costs associated with investment in cable television, fiber optic, and telecommunications network and telecommunications business-related facilities, are borne by the investors in such business, and in no event are borne by the city's taxpayers, the state of Vermont, or are recovered in rates from electric ratepayers.

24 V.S.A. App. Ch. 3 § 438(c)(1).

¶ 5.    In September 2005, the PSB issued a certificate of public good (CPG).  Condition 60 of the CPG prohibited the use of public money to pay for BT's "build-out" or construction costs.  Condition 60 specifically states:

> The City shall make payments on behalf of [BT's build-out] only when and to the extent that BT has cash reserves, revenues receivable, or other payments receivable that, collectively, equal or exceed the sum of the payments to be made by the City plus the balance of any other current payments owed to the City.  BT may participate in the City's pooled cash management system provided, however, that BT shall reimburse the City within two months of the City's expenditure for any expenses incurred or payments made by the City in support of services that BT provides to non-City entities.  The City shall obtain Board approval prior to appropriating any funds other than as described above in the support of BT's [build-out] activities.

¶ 6.    Since 2007, BT has been unable to meet its construction costs and other expenses from operating revenues.  Beginning in January 2007, it withdrew more money from the City's pooled cash account than it paid in.  The pooled cash account is the equivalent of a common checking account maintained for the use of all City departments.  By March 2007, BT had run a deficit in the account for more than sixty days in violation of Condition 60.  According to defendants, BT repaid its initial overdraft in August 2007 when it obtained financing from CitiCapital.  By November 2007, however, BT was again drawing more money out of the pooled cash account than it put in.  By January 2008, BT was again in violation of Condition 60 because the deficit had lasted more than sixty days.  The deficit continued and as of September 2012, it was approximately $16.9 million.

¶ 7.    Defendant Jonathan Leopold was the City's CAO from April 2006 until July 1, 2011.  As CAO, Leopold had direct supervisory authority over BT's finances and the use of the pooled cash account.  In his deposition, Leopold stated that he was unaware of Condition 60 and the restriction on the account's use until November 2008, when an attorney for the City informed him about the condition.  Leopold characterized his decision to allow BT to run a large deficit in violation of the charter amendments and the CPG as a pragmatic decision to borrow money in

3

the short-term until refinancing was in place. He stated that refinancing became unavailable in 2008 when credit markets entered a state of crisis.

¶ 8. The trial court found no evidence that any funds withdrawn from the pooled cash account were used for any purpose other than BT's construction costs and other normal business expenses. There was no evidence—and no allegation whatsoever—of corruption or personal benefit to Leopold or any other City employee. Taxpayers alleged only that the use of the City funds was unauthorized and occurred in obvious violation of the charter and the CPG.

## II. Pre-Trial Rulings

¶ 9. Plaintiff-taxpayers sued defendants in December 2009. In their fourth amended complaint, taxpayers raised a claim against the City and Leopold seeking "recovery of taxpayer funds paid to [BT] in violation of law." Taxpayers also raised claims of fraud and deceit, and breach of duty of faithful performance, against Leopold.[1] In addition to equitable relief with respect to their first claim, taxpayers sought a declaratory judgment that Leopold breached his duty of faithful performance and his fiduciary duty; an accounting concerning, among other things, payments made to BT and the amount that BT owed to the City; and an order permanently enjoining the City from taking any further actions that violated BT's CPG or the Burlington City Charter, or which were likely to place Burlington taxpayers at further risk as a legal or practical matter.

¶ 10. In February 2010, the court issued an interim stipulated order prohibiting the City from using any City money to make any payment to CitiCapital unless authorized by the PSB, or using City money to make any other payments in violation of Condition 60 of the CPG. Each month, the City was also required to provide taxpayers with documentation of BT's ability to reimburse the City pooled cash management system out of current revenues within sixty days, including a daily statement of City accounts; a statement of due to/due from BT; a statement of

---

[1] The trial court granted summary judgment to Leopold on the fraud and deceit claim, and taxpayers do not challenge this ruling on appeal.

4

BT receivables; a statement of BT accounts payable; BT's anticipated balance due to the City; and BT's cash actual/forecast.

## A. Dismissal of Claims against City

¶ 11. The parties filed various pretrial motions for summary judgment and motions to dismiss. As relevant here, the City moved to dismiss the count against it, arguing in part that the court should apply the doctrine of primary jurisdiction and decline to exercise jurisdiction in favor of the PSB. The City explained that its violation of Condition 60 was the subject of PSB Docket No. 7044, and that the PSB would address the remedy for that violation. In a similar vein, the City argued that taxpayers' claim was not ripe for review because the PSB was addressing the same issues and the City's cure period was ongoing. The court agreed with the City in a September 2012 decision, finding it better to defer to the PSB process. The court thus dismissed taxpayers' claim against the City without prejudice to it being re-filed upon the closing of PSB Docket No. 7044. Taxpayers do not appeal this ruling.

## B. Accounting Ruling

¶ 12. In its September 2012 decision, the court also denied taxpayers' request for an accounting from the City. The court explained that equitable jurisdiction for an accounting was usually invoked where: (1) there is a fiduciary relationship between the parties, accompanied by a duty on the defendant's part to render an account; (2) there are mutual accounts, or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery. The City explained that it had produced tens of thousands of pages of documents in discovery, and also provided monthly reports, copies of status reports to the PSB, and actual printouts from the City's accounting and financial management program. The court agreed that there had been ample discovery, and found that taxpayers did not explain with specificity what more they needed. It thus declined to order an accounting.

5

¶ 13. The court revisited the accounting issue on a motion for reconsideration. It found that taxpayers sought an open-ended comprehensive accounting by an independent accountant, acting under the auspices of the court, of all money spent by the City on BT's development over the course of four years. Through this process, they sought to determine if taxpayer money was diverted or misspent in some way. The total amount involved exceeded $30 million. Taxpayers sought to have the City pay for the cost of this investigation. The court explained that it had discretion in deciding whether an accounting was appropriate, and for various reasons, it declined to order an accounting here. In reaching its decision, the court noted that it had found no case where a taxpayer's suit resulted in an open-ended audit of an entire city department in response to a generalized concern that money was mishandled.

C. Taxpayers' Claims Against Leopold and Leopold's Motion for Summary Judgment

¶ 14. The court also considered pretrial motions relating to taxpayers' claims against Leopold for "recovery of taxpayer funds paid to BT in violation of law" and "breach of the duty of faithful performance." Under each theory, taxpayers sought a judgment requiring Leopold to repay the $16.9 million in cost overruns.

¶ 15. Taxpayers moved for summary judgment against Leopold on their claim for "recovery of taxpayer funds," urging a strict liability rule for public officials who spend money without legal authorization. The court rejected this approach. Quoting a prominent authority on the subject, the court explained that:

> To justify the bringing of a taxpayer's action some improper motive of an officer is essential. The act complained of need not be corrupt in the sense of not being induced by a desire for pecuniary gain; but it must be done to accomplish some purpose foreign to the interest of the municipality which is tantamount to fraud. Bad judgment, even gross incompetency, is not bad faith.

18 E. McQuillin, The Law of Municipal Corporations § 52.07, at 14 (3d ed. rev. 2003). The court concluded that a strict-liability approach "imposes an overly harsh sanction on well-

motivated public officials." Stanson v. Mott, 551 P.2d 1, 15 (Cal. 1976). The court therefore denied taxpayers' motion for summary judgment.

¶ 16. Leopold also moved for summary judgment, arguing that he was entitled to qualified official immunity from taxpayers' claims.[2] The court rejected this argument as well, finding material facts in dispute. The court determined that the absence of malice, corruption, personal gain, or similar improper motive was not sufficient to establish the "good faith" element of the qualified immunity defense. Instead, the analysis must focus on "the objective reasonableness of the official's conduct in relation to settled, clearly-established law." Hoffer v. Ancel, 2004 VT 38, ¶ 12, 176 Vt. 630, 852 A.2d 592 (mem.) (quotation omitted). The court observed that Leopold remained free to prove at trial that he had an objectively reasonable belief that his actions in overdrawing the pooled cash account were lawful, and this defense was independent of the substantive elements of the claim against him, and independent of any immunity conferred by 24 V.S.A. § 903.

¶ 17. Taxpayers also claimed that Leopold violated his duty of "faithful performance" by authorizing taxpayer funds to be paid to BT in violation of Condition 60 of the CPG and the city charter. Taxpayers sought a declaratory judgment to this effect, and argued that they were entitled to look to Leopold's surety for repayment. As the court noted, this claim followed the language of the bonding statute. See 24 V.S.A. § 832 (providing that before town officer, who is authorized to receive or disburse town funds, embarks on duties, selectboard shall require that person "to give a bond conditioned for the faithful performance of his or her duties," and "[a]ll such bonds shall be in sufficient sums and with sufficient sureties as prescribed and approved by the selectboard"). The court concluded that it would be premature to declare the liability of any

_____

[2] The court initially found it unnecessary to address qualified immunity in light of 24 V.S.A. § 903, which provides: "An action shall not be maintained against a person for money paid out by him as an officer of a municipal corporation in accordance with a vote of such corporation, whether such vote was valid or not." The court initially found the requirements of this statute satisfied, but later found a dispute of fact material to the statute's application. Thus, in an April 2013 ruling, it revisited the pretrial motions that related to Leopold's liability.

surety because Leopold's liability (if any) had not yet been established, citing <u>Keefe v. Atkins</u>, 285 S.W.2d 338, 342 (Tenn. 1955) ("[T]he liability of a surety . . . on an official bond depends upon the liability of the principal.").

¶ 18.    Finally, as part of its ruling on taxpayers' motion for summary judgment, the court sought to clarify the specific elements of taxpayers' cause of action against Leopold. Taxpayers principally relied upon a theory that Leopold breached his duty of faithful performance. While this theory was facially attractive, it assumed that officers of corporations and municipalities were personally liable if they violated budget rules and regulatory requirements. Citing McQuillin, the court found the remedy for an employee's misconduct was unfavorable to taxpayers in cases where there was no fraud, crime, or personal benefit to the employee. See 18 E. McQuillin, The Law of Municipal Corporations § 52.07, at 14 (3d ed. rev. 2003) (liability requires showing of purpose contrary to interest of municipality). There was no allegation in this case that taxpayers' money was spent for any purpose other than to build BT and to cover its operating losses. The court concluded that taxpayers' cause of action should be limited to cases involving bad faith, that is, cases involving the spending and misappropriation of funds for the benefit of the official or to cause harm to the city. Here, it appeared undisputed that Leopold planned to run an overdraft only for as long as it took to secure new financing as he had done before. If this was indeed undisputed, the court found it hard to see how taxpayers could prove bad faith.

¶ 19.    The court proposed that the elements of taxpayers' cause of action be defined as follows:  (1) the official authorized the expenditure of city funds in violation of law, including regulatory conditions; (2) the official acted in bad faith, which is defined as intending to benefit himself or others financially or to cause harm to the city; and (3) funds or property of the city were paid to the official or other persons and not repaid to the city. The court found this cause of action to be a form of equitable restitution, and cited the Restatement (Third) of Restitution and

Unjust Enrichment, § 43 (2011), in support of its proposal. See id. ("A person who obtains a benefit (a) in breach of a fiduciary duty, (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or (c) in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed."). The court concluded that this approach provided a predictable and familiar remedy; it did not create a new cause of action, previously unrecognized in Vermont; it solved the problem of "double recovery" presented by taxpayers' proposal that Leopold simply repay the money currently invested in BT, money that was not truly "missing" and which had benefitted the City and strengthened BT; and it did not impose liability upon officials who violated state law by overspending but who had directed this spending to legitimate municipal purposes. The court invited the parties to file a last motion for summary judgment addressing these concerns, but the parties did not do so.

### D. Jury Trial Request

¶ 20. Taxpayers subsequently requested a jury trial on their remaining claims against Leopold. The court, with a new presiding judge, denied their request. It found that taxpayers appeared to have accepted the court's analysis that their claim against Leopold was a form of equitable restitution, and a jury trial was not available for claims seeking equitable relief.

### III. Final Judgment

¶ 21. Following a bench trial, the court granted judgment to Leopold. The court did not rely on the elements of the cause of action identified above. Instead, the court construed taxpayers' claims as a breach-of-fiduciary-duty claim as well as claim for a special sort of breach of fiduciary duty by a government employee. Citing Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011), the court found that to establish a breach-of-fiduciary-duty claim, taxpayers must show: (1) the existence of a fiduciary duty; (2) knowing breach of that duty; and (3) damages from that breach.

¶ 22. The court found that Leopold had a fiduciary duty to the City in his role as CAO.[3] It further determined Leopold acted without any bad faith and with the City's best interest in mind. While his choices might have been wrong, the court found nothing to suggest that Leopold was motivated by any evil intent or self-interest. The court agreed with taxpayers, however, that a bad motive was not the only way to violate a fiduciary duty. Relying on a case that did not involve the liability of a municipal officer, the court reasoned that a fiduciary may act in good faith, but still fail to use "the care an ordinarily prudent person in a like position would exercise under similar circumstances." J.A. Morrissey, Inc. v. Smejkal, 2010 VT 66, ¶ 10, 188 Vt. 245, 6 A.3d 701.

¶ 23. The court concluded that a prudent CAO would not have withheld significant financial information about the CPG violation from the Mayor, the Board of Finance, and the City Council for the five-to-six-month period that Leopold did so. This information, the court concluded, was something that the City would have wanted to know. Thus, the court found that Leopold breached his fiduciary duty to the City by failing to promptly inform the Mayor, Board of Finance, and City Council of the Condition 60 violation. It also found that Leopold breached his fiduciary duty by allowing the violation to continue for several months without consulting the Mayor, Board of Finance, and City Council, to allow them to decide if that was the proper course of action.

¶ 24. The court next considered what damages, if any, flowed from this breach. The court found that the money that BT owed to pooled cash increased by several million dollars between November 2008 and May 2009. The court found no proof, however, that this would not

---

[3] In a footnote, the court found that to the extent that taxpayers sought to assert a separate claim for breach of a duty under 24 V.S.A. § 832, that statute simply said that employees such as Leopold were required to give bonds "for the faithful performance of his or her duties," and that the employee's failure to do so (after being directed to) would lead to his or her termination. The court saw nothing in the statute creating a right of action or creating any duty other than the duty to obtain a bond, nor was any evidence presented as to whether Leopold had obtained a bond.

10

have occurred anyway. It cited evidence that the City Council had repeatedly approved ongoing expenditures while other financing was being sought; BT had projected it would bring in $70 to $80 million for the City between 2009 and 2022; and a report that the City had commissioned to assess BT's viability going forward had agreed that BT was very valuable and predicted a positive cash flow for BT by 2013. Given this evidence, the court did not believe that an earlier disclosure by Leopold would have changed the course of events with regard to BT's use of City funds. The court noted that even the PSB, when told that BT had a $10.8 million unpaid debt to the City in November 2008, took no action, which suggested to the court that the debt alone was not a red flag that BT was in trouble. The court therefore found insufficient proof of a causal connection between the breach of duty and the increase in BT's debt to the City.

¶ 25. Taxpayers also appeared to argue that they had a separate and unique cause of action against government employees with responsibility for public funds. Taxpayers cited no Vermont cases or statutes establishing a special cause of action against municipal employees for personal liability in these circumstances, beyond the normal confines of a fiduciary duty claim, and the court found none. The City Charter did not create any private right of action for taxpayers. The court concluded that the doctrine of fiduciary duty and what it required of those entrusted to care for others' funds seemed perfectly designed to address the case before it, and there did not appear to be any other source in Vermont law for another theory to reach the same facts. Given its conclusions, the court did not address the other defenses proffered by Leopold. The court entered judgment for Leopold, and this appeal and cross-appeal followed.

IV. Claims on Appeal

A. Accounting

¶ 26. We begin with taxpayers' assertion that the trial court erred in denying their request for an accounting from the City. According to taxpayers, the court initially based its decision on "primary jurisdiction," but changed its ground on reconsideration to

11

"nonjusticiability." Taxpayers contend that both grounds are incorrect. As to the latter ground, taxpayers assert that the court was overly concerned by the nature of the accounting remedy. They contend that an accounting is a standard equitable remedy and that the scope of the accounting requested does not present a particularly difficult issue.

¶ 27. We reject taxpayers' construction of the court's decision. The court did not base its decision on primary jurisdiction or nonjusticiablity. While it discussed various issues in reaching its decision, the court explicitly recognized that it had broad discretion in deciding whether to order an accounting and denied taxpayers' request as an exercise of that discretion. See First Commodity Traders, Inc. v. Heinhold Commodities, Inc., 766 F.2d 1007, 1011 (7th Cir. 1985) ("Because an accounting is an equitable remedy, a court has broad discretion to determine whether it is appropriate to order an accounting."). We review the court's decision for abuse of discretion, which "requires a showing that the court withheld its discretion entirely or exercised it on clearly untenable grounds." Shattuck v. Peck, 2013 VT 1, ¶ 10, 193 Vt. 123, 70 A.3d 922 (quotation omitted). Taxpayers fail to show an abuse of discretion here.

¶ 28. As the trial court stated, an equitable accounting is generally invoked where there is a need for discovery, the accounts at issue are complicated, there is a fiduciary or trust relationship, and legal remedies are inadequate. See, e.g., Bossaler v. Red Arrow Corp., 897 S.W.2d 629, 630 (Mo. Ct. App. 1995) (identifying basic elements of equitable accounting claim). The heart of taxpayers' claims is that payments were made to BT in violation of the charter and the CPG. This appears to be undisputed. The City disclosed extensive information to taxpayers in response to the claims in their complaint and the court reasonably found no basis for the additional inquiries sought by taxpayers. There was no dispute as to the amount that BT owed to the general fund. The timing and amount of payments made from the general fund to BT were documented in the financial records provided by the City. The City also provided taxpayers with independent audit reports, which reviewed the financial and accounting records during the

relevant time period. Additionally, taxpayers received monthly information from the City pursuant to the interim stipulated order.

¶ 29. The question of how the City's payments were used at BT over a four-year period presents a much different issue than whether the payments were made in violation of the charter and the CPG. This question was not relevant to any claim before the court. As the trial court concluded, taxpayers sought to use the court's judicial authority for no particular end and to answer no specific legal question. Taxpayers essentially proposed a very expensive and time-consuming fishing expedition, one that the court, in its broad discretion, reasonably rejected. Taxpayers war with the trial court's decision, complaining that the court was overly concerned about the nature of the accounting remedy and that the scope of the accounting does not present a particularly difficult issue. Taxpayers' disagreement with the court's conclusions does not demonstrate an abuse of discretion. See, e.g., Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571, 980 A.2d 799 (explaining that arguments which amount to nothing more than a disagreement with court's reasoning and conclusion do not make out a case for an abuse of discretion). We find no error in the court's denial of taxpayers' request for an accounting.

B. Leopold's Liability

¶ 30. We turn next to the parties' arguments concerning Leopold's liability. Taxpayers challenge the court's breach-of-fiduciary-duty analysis, particularly its conclusion that no harm resulted from Leopold's actions. According to taxpayers, there was evidence to show that the City Council would have cut off payments to BT if Leopold had disclosed the CPG violation in November 2008 when he learned of it. In any event, taxpayers argue, Leopold had the burden to show that the harm would have occurred regardless of his breaches, and he failed to do so. To the extent that proximate cause is an issue, taxpayers argue that they were entitled to have a jury decide this question.

13

¶ 31. Taxpayers also appear to reiterate their argument that there is some sort of separate special duty applicable to municipal employees. They argue that Leopold thwarted the taxpayers' right to enjoin the illegal expenditures by concealing them, and therefore, Leopold or his insurer should be liable for repayment. In connection with this argument, taxpayers advocate a "due care" standard for municipal employees as set forth in Stanson, 551 P.2d at 15. They also assert that they had the right to seek a declaratory judgment as to whether Leopold violated his "duty of faithful performance."

¶ 32. In his cross-appeal, Leopold argues that the trial court erred in finding that he breached a fiduciary duty because taxpayers never pled such a claim, and because he acted with the City's best interests in mind and without bad faith. Leopold contends that the court erred in finding his duty to the City analogous to that applicable to private industry. According to Leopold, established law dictates that a municipal officer does not breach a fiduciary duty absent malice, ill-will or self-dealing, and here, the trial court found that he acted in good faith. Leopold maintains that judgment in his favor is further warranted by his immunity defenses.[4]

¶ 33. We begin by considering the precise nature of taxpayers' claims. In their complaint, taxpayers raised the following legal claims against Leopold: "recovery of taxpayer funds paid to BT in violation of law," and "breach of duty of faithful performance." They sought to hold Leopold or his surety liable for the $16.9 million in cost overruns and to recover this money through "[d]isgorgement, restitution or other equitable relief resulting in the repayment with interest of all amounts improperly paid to BT from the General Fund." They also sought a declaratory judgment that Leopold "breached his duty of faithful performance and his fiduciary duty by authorizing expenditures from the City's cash pool to BT" in violation of the city charter and the CPG.

---

[4] These include Leopold's assertions that taxpayers' claims are barred by the absolute immunity doctrine, the qualified immunity doctrine, and by the statutory immunity provided in 24 V.S.A. § 901.

14

¶ 34. As the trial court recognized in its pretrial ruling, taxpayers' causes of action are not easily defined and neither party attempted to identify any particular elements of these broadly stated claims. It is well-established that a taxpayer may file suit seeking relief from certain official actions. See Cent. Vt. Pub. Serv. Corp. v. Town of Springfield, 135 Vt. 436, 438, 379 A.2d 677, 679 (1977) (stating that taxpayer suits have "long been recognized as appropriate vehicles for seeking relief from official action").[5] Taxpayer suits are

> a derivative proceeding based on some illegality for which the municipality would have a right of action. The theory of such suits is that the money or property squandered or about to be squandered belongs to the taxpayers, and hence every taxpayer has a substantial interest in it, which he or she is entitled to have protected.

18 E. McQuillan, The Law of Municipal Corporations § 52.03.10, at 6 (3d ed. rev. 2003) (footnotes omitted).

¶ 35. Taxpayer suits are "intended to protect the taxpayer against dishonest officials . . . and against illegal contracts"; they are not to be used "as an instrument for unwarranted attacks on honest officials." Id. § 52.04, at 7. Thus, McQuillan states that:

> To justify the bringing of a taxpayer's action some improper motive of an officer is essential. The act complained of need not be corrupt in the sense of not being induced by a desire for pecuniary gain; but it must be done to accomplish some purpose foreign to the interest of the municipality which is tantamount to fraud. Bad judgment, even gross incompetency, is not bad faith.

Id. § 52.07, at 14. We have echoed this sentiment in our case law. See Cent. Vt. Pub. Serv. Corp., 135 Vt. at 439, 379 A.2d at 680 (concluding in taxpayer action that when municipality has accepted benefits wrought by performance of contract that is invalid for failure to satisfy some

---

[5] We note that many states have statutes governing when a taxpayer action is appropriate. See 18 E. McQuillan, The Law of Municipal Corporations § 52.05, at 11 (3d ed. 2003) ("In most jurisdictions, the right to bring a taxpayers' suit is regulated by statute. . . . The purpose of the statutes authorizing a taxpayer's action is not to confer upon the taxpayer the power to bring actions which the public authorities have no power to bring, but . . . to confer upon the taxpayer the right to bring such an action in the cases specified in the statute which are cases where the relief sought could be obtained by appropriate proceedings on the part of public officers." (footnotes omitted)).

formality in its execution, but within apparent scope of municipality's authority, municipality, or taxpayer suing in its behalf, should not be allowed to recover funds paid absent evidence of "fraud, collusion, or like conduct on the part of the contracting party").

¶ 36. Mindful of these authorities and the nature of taxpayer suits in general, we conclude that the breach-of-fiduciary-duty test used by the trial court encompasses too wide a range of discretionary behavior and it is not the appropriate standard here. We also reject taxpayers' assertion that there are two separate standards available in cases such as this one—the standard applicable in breach-of-fiduciary-duty cases as well as another special standard for public officials. Determining when a public official will be held personally liable calls for a distinct test and one set of factors must govern when and under what circumstances a taxpayer can recover funds from a municipal officer.

¶ 37. We do not adopt the "due care" test advocated by taxpayers. We note, however, that the "due care" standard is not as broad in application as it appears, and even assuming arguendo that we were to adopt this standard, we would not find Leopold liable upon these facts.

¶ 38. We agree with the court's pretrial ruling that taxpayers' cause of action must include an element of bad faith, that is, evidence of spending or misappropriation of funds for the personal benefit of the official or for the purpose of causing harm to the municipality. The court's pretrial construction of taxpayers' claim as one seeking equitable restitution makes sense for the reasons identified by that court. It defines taxpayers' remedy in a way that is predictable and familiar and it does not create a new cause of action. Thus, to recover, taxpayers must show that: (1) the official authorized the expenditure of city funds in violation of law, including regulatory conditions; (2) the official acted in bad faith, defined as intending to benefit himself or others financially, or to cause harm to the city; and (3) funds or property of the city were paid to the official or other persons and not repaid to the city.

16

¶ 39. Other courts similarly require a showing of "bad faith." In Adams v. Bryant, 370 S.W.2d 432, 436-37 (Ark. 1963), for example, the plaintiffs brought a taxpayers' suit seeking injunctive relief against a city's light and water commissioners. The taxpayers argued that the commissioners had used city funds to purchase stock in violation of the state constitution, and they asked the court to order the commissioners to return the money. The court held that individuals who acted in good faith would not be held individually liable, and there must be evidence that the commissioners acted willfully or maliciously. Id. at 436. "Were the rule otherwise," the court explained, "few persons of responsibility would be found willing to serve the public in that large capacity of offices, which require a sacrifice of time and perhaps money, but affords neither honor nor profit to the incumbent." Id. (quotation omitted). See also Powers v. Goodwin, 291 S.E.2d 466, 470, 476 (W. Va. 1982) (explaining that by statute, municipal officer is personally liable for amount illegally expended if he or she willfully participates in violating certain statutory fiscal limits, but statute does not encompass actions taken in good faith even if negligent; to hold officials personally liable, court must find that officer intended to expend funds for what officer thought was an unauthorized purpose; "[i]n other words, 'good faith' is a defense to personal liability under the statute"); Bd. of Educ. of Oklahoma City v. Cloudman, 92 P.2d 837, 840 (Okla. 1939) ("Usually, nothing short of willful misconduct will subject an officer to liability for acts done in the exercise of his official discretion. . . . In the absence of malice, oppression in office, or willful misconduct, public officers cannot ordinarily be held liable for mistaken exercise of discretion, or error in judgment, in the performance of official duties. This is an expression of the common law, and applies to every discretionary act of all public officials in this state, in the absence of positive legislative enactment to the contrary." (quotation omitted)).[6] We find the policy concerns identified by these cases compelling here.

_____

[6] As Powers illustrates, some states have enacted legislation that addresses the

¶ 40. Although the trial court ultimately did not apply the test that we now adopt, the undisputed facts and the court's post-trial findings are sufficient to allow us to affirm its judgment in Leopold's favor. As set forth above, the court found that Leopold acted without any bad faith, and with the City's best interests in mind. There was no self-dealing, no effort by Leopold to line his pockets or those of his friends, and no inappropriate motive. To the extent that Leopold permitted payments for BT to continue after November 2008, he did so because he believed it was necessary to keep BT in operation, and that doing so was in the City's best interests. While those payments violated the CPG, they were all spent on a City enterprise that Leopold believed was a benefit to the City. In light of these findings, we agree with the trial court that Leopold should not be held personally liable for the cost overruns here. We thus affirm its judgment on different grounds.

¶ 41. Finally, we reject taxpayers' argument that they had the right to a declaratory judgment as to whether Leopold violated his "duty of faithful performance." "The purpose of a declaratory judgment action is to enunciate, so far as is requested and is appropriate, the rights of the parties . . . ." Graves v. Town of Waitsfield, 130 Vt. 292, 295, 292 A.2d 247, 249 (1972) (citations omitted); see also 12 V.S.A. § 4711 ("Superior Courts within their jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."). Taxpayers rely on 24 V.S.A. § 832, which provides that before a town officer, who is authorized to receive or disburse town funds, embarks on his or her duties, the selectboard shall require that person "to give a bond conditioned for the faithful performance of his or her duties," and "[a]ll such bonds shall be in sufficient sums and with sufficient sureties as

---

circumstances under which public officials will be subject to personal liability for violations of spending limits. See also Burt v. Blumenauer, 699 P.2d 168, 177 (Or. 1985) (discussing Oregon's personal liability statute, O.R.S. § 294.100). While Vermont law limits the liability of a municipal official for expenditure of public funds made in accordance with a vote by a municipal corporation, see 24 V.S.A. § 903 ("An action shall not be maintained against a person for money paid out by him as an officer of a municipal corporation in accordance with a vote of such corporation, whether such vote was valid or not."), we have not yet considered the standard by which to evaluate claims that fall outside of this statute.

prescribed and approved by the selectboard."[7] We agree with the trial court that, assuming arguendo this statute applied to city officials, there is nothing in the statute creating a right of action and the statute imposes no duty on officials other than the duty to obtain a bond.[8] There was no evidence presented here as to whether Leopold did or did not obtain a bond, and declaratory relief was not warranted on this issue. The question of Leopold's liability for his actions related to his performance in office, moreover, is controlled by the discussion above.

¶ 42. Given our conclusions, we need not address Leopold's immunity defenses or remaining arguments. We similarly need not consider taxpayers' assertion that, to the extent that proximate cause is an issue, they were entitled to have a jury decide this question.[9] Our conclusion rests on the absence of bad faith, not the absence of proximate cause.

Affirmed.

FOR THE COURT:

_____

Chief Justice

---

[7] By its terms, the statute applies to town officials. The Burlington City Charter contains a similar provision, stating that "The Treasurer and all other City officers who receive or disburse any of the funds of the City shall annually, before entering upon the duties of their office, give bonds to the City in amount satisfactory to the City Council for the faithful discharge of their respective duties." 24 V.S.A. App. Ch. 3, § 134.

[8] The remedy for failing to obtain a bond, after being notified of such failure by the City Council, is provided in the Burlington City Charter. See 24 V.S.A. App. Ch. 3, § 136.

[9] On appeal, taxpayers do not argue that they were entitled to a jury on any other aspect of their breach-of-duty claim, and accordingly, we do not reach the question.